UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| **PAXTON WILLIAMS,**<br>　　　Plaintiff,<br>vs.<br><br>**JOHN DOES 1-8, JACOB HEDLUND, &**<br>**TRUDY PAULSON,** individually and in their official capacity as law enforcement officers for the Des Moines, Iowa Police Department; Sergeant **JEFF ROBINSON,** individually and in his official capacity as a law enforcement officer for the Des Moines, Iowa Police Department; **DANA WINGERT,** individually and in his official capacity as Chief of Police for the Des Moines, Iowa Police Department; **CITY OF DES MOINES, IOWA,**<br>　　　Defendants. | Case No. 4:22-CV-00240-SBJ<br><br><br><br>**PLAINTIFF'S STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS** |

**COMES NOW** the Plaintiff, Paxton Williams, and submits the following additional disputed material facts in this matter.

1. Paxton Williams had seen the video of George Floyd's death and believed it was a racially-motivated murder. (Williams Affidavit, P. App. 8).[1]

2. Paxton Williams was aware of the pepper-spraying, zip-typing, and arrest of the journalist Andrea Sahouri on May 31, 2020, and believed it was racially-motivated violence. (Williams Affidavit P. App. 8).

3. On June 1, 2020, Williams was an attorney for the State of Iowa, and had taken an oath and solemnly swore to support the Constitution of the United States and Constitution of the State of Iowa. (Williams Affidavit P. App. 8).

---

[1] Citations to Plaintiff's Appendix in Support of Resistance to Motion for Summary Judgment are to "P. App. [page number]." Citations to Defendants' Appendix in Support of Motion for Summary Judgment are to "App. [page number]."

1

4. Williams was wearing a mask and glasses because of COVID. (Williams Affidavit P. App. 8).

5. It was common practice for Williams, and others, at the time to wear masks and eye coverings out in public because of COVID. (Williams Affidavit P. App. 9).

6. The purpose of Williams joining the march with others throughout downtown Des Moines and to the Iowa State Capitol was as a support for racial justice and to observe and bear witness to the actions taking place. (Williams Affidavit P. App. 9).

7. The protest at the Capitol was overwhelmingly peaceful. (Williams Affidavit P. App. 9).

8. The speakers and members of the protest crowd loudly and fully condemned the one instance of someone throwing a water bottle toward law enforcement officers. (Williams Affidavit P. App. 9).

9. Williams observed law enforcement officers become aggressive without cause and engage in reckless, harmful, and unconstitutional activity. (Williams Affidavit P. App. 9).

10. Williams observed law enforcement officers at the Capitol intentionally using force on peaceful protestors with no lawful justification. (Williams Affidavit P. App. 9).

11. Williams observed law enforcement officers at the Capitol knowingly placing protestors in physical danger through indiscriminate use of excessive force. (Williams Affidavit P. App. 9).

12. Williams observed individuals hit by flashbangs, use of tear gas and officers firing other weapons indiscriminately into crowds of peaceful protestors starting before 11:45 p.m. (Williams Affidavit P. App. 9).

13. Williams observed law enforcement officers run towards and push bicyclists who were trying to leave the Capitol area on their bikes. (Williams Affidavit P. App. 9).

14. Williams observed excessive use of force injure protestors, journalists, and bystanders. (Williams Affidavit P. App. 9)

15. Williams observed law enforcement's wrongful actions chilling individuals from exercising their First Amendment rights. (Williams Affidavit P. App. 9).

16. Williams was shocked by what he observed from law enforcement officers on June 1, 2020, including the violence that was instigated by, and escalated by, the officers chasing individuals and using weapons on peaceful protestors. (Williams Affidavit P. App. 9).

17. Williams ran away from the bedlam and violence caused by the actions of law enforcement. (Williams Affidavit P. App. 9).

18. Williams was not told personally by any police officer to leave the Capitol at any time on June 1, 2020. (Williams Affidavit P. App. 9).

19. When Williams left the Capitol, he was not travelling with any particular group, but instead was returning to his home at 400 East Locust Street. (Williams Affidavit P. App. 10).

20. Williams stopped at the entryway of his home at 400 East Locust Street, and watched injured individuals running from the law enforcement officers run by his home. (Williams Affidavit P. App. 10).

21. Williams was alone in front of his home at 400 East Locust Street when law enforcement officers, dressed in riot gear, approached the entryway to his home. (Williams Affidavit P. App. 10).

22. Williams was not given an order to disperse while at his residence. (Williams Affidavit P. App. 10).

23. Williams was not asked to return inside his residence. (Williams Affidavit P. App. 10).

24. Williams was not asked if he lived at the address where he was standing before he was sprayed and tackled. (Williams Affidavit P. App. 10).

25. When officers yelled at Williams to move, he pointed to his home and indicated he lived there, twice, as indicated by Officer Hedlund's body camera footage at 5:30 – 5:50. (Williams Affidavit P. App. 10, Hedlund Video 5:30-5:50 App. 3).

26. When officers continued to advance on Williams even though he had said in a calm voice and gestured that he lived here, and continued to yell "move," Williams backed up quickly towards the gate to enter his residence, as indicated by Officer Hedlund's body camera footage at 5:30 – 5:50. (Williams Affidavit P. App. 10, Hedlund Video 5:30-5:50 App. 3).

27. Williams did not turn his back on the officers, even though he was backing up because he was scared of them, due to what he had seen them do to other innocent people that evening. (Williams Affidavit P. App. 10).

28. Williams was never given any opportunity to access or open the gate the return into his residence. (Williams Affidavit P. App. 10).

29. Williams could not have retreated west bound or north bound without either leaving his residence, or being allowed to open a closed, locked gate and id not reach into his pocket to get his key to the locked gate because of the aggression of the approaching officers, and instead tried to leave his hands where the officers could see them. (Williams Affidavit P. App. 10).

30. Williams was never given a chance to submit to arrest and avoid being sprayed and tackled. (Williams Affidavit P. App. 10).

31. Williams did not flee from officers, but moved backwards towards the locked gate when he was told by the officers to move. (Williams Affidavit P. App. 10).

32. Defendant Jacob Hedlund ran towards Williams and sprayed him in the eyes with a harmful chemical, which immediately caused Williams to buckle to his knees and caused him immense pain. (Williams Affidavit P. App. 11).

33. Williams did not yell "fuck you" at the officers until after it was obvious that they were going to spray him in the face regardless of the fact that he was moving backwards as ordered, just as they had done to other innocent people that night. (Williams Affidavit P. App. 11).

34. Law enforcement, including Jacob Hedlund forcefully tackled Williams and handcuffed him. (Williams Affidavit P. App. 11).

35. Williams was afraid for his life when he was sprayed in the eyes and tackled without warning. (Williams Affidavit P. App. 11).

36. It was clear to Williams that even though he was moving as requested that law enforcement, including Officer Hedlund, wanted to spray him in the eyes, and tackle him, for the purpose of causing him pain, not for any legitimate purpose. (Williams Affidavit P. App. 11).

37. Williams was not rioting on June 1, 2020. (Williams Affidavit P. App. 11).

38. Williams did not throw any objects at any Des Moines police officers on June 1, 2020, or at any time. (Williams Affidavit P. App. 11).

39. Williams was not present when other individuals purportedly threw bricks, rocks, water bottles, full milk jugs, or bottles of urine at any Des Moines police officers. (Williams Affidavit P. App. 11).

40. Williams did not pose a threat to officers on June 1, 2020 or at any time. (Williams Affidavit P. App. 11).

41. Williams did not loot or create any property damage on June 1, 2020 or at any time. (Williams Affidavit P. App. 11).

42. Williams was not present when any looting or property damage was occurring on June 1, 2020. (Williams Affidavit P. App. 11).

43. Williams was arrested for "running his mouth," not for committing any crimes. (Williams Affidavit P. App. 11).

44. Williams did not have any weapons or guns on June 1, 2020. (Williams Affidavit P. App. 11).

45. No one Williams was associated with had any weapons or guns on June 1, 2020. (Williams Affidavit P. App. 11).

46. Other than law enforcement officers, Williams did not see anyone on June 1, 2020 with any weapons or guns. (Williams Affidavit P. App. 11).

47. Williams did not have a "blacked out vehicle" on June 1, 2020, nor was he associating with anyone in a "blacked out vehicle" on June 1, 2020. (Williams Affidavit P. App. 11).

48. Williams was not in a vehicle that was told to leave by Officer Hedlund at any time. (Williams Affidavit P. App. 11).

49. The individual captured by Officer Hedlund's body camera between 5:05 and 5:10 running was not Williams, and was not associated with him and many people were running away in fear from law enforcement that evening. (Williams Affidavit P. App. 12).

50. It was obvious to everyone present for Williams' arrest and questioning that he was arrested at his home because Williams clearly told officers that fact. (Williams Affidavit P. App. 12).

51. When Sgt Robinson called Williams five hours after submitting his complaint to the police department, Robinson did not say that there were "some things" that were contradicted by the video of Williams' arrest, but instead that the video "refuted everything" in his complaint. (Williams Affidavit P. App. 12).

52. Everything in Williams' complaint to the police department was completely true and supported by the officers' body camera footage. (Williams Affidavit P. App. 12).

53. Williams understood Sgt Robinson's phone call to be an attempt to intimidate him into withdrawing his complaint. (Williams Affidavit P. App. 12).

54. Sgt Robinson was not truthful with Williams on the phone call because there was nothing in Williams' complaint to the police department that was refuted by the body camera footage. (Williams Affidavit P. App. 12; Hedlund Video App. 3; Williams Complaint App. 136-138; Williams Interrogatory No. 19, P. App. 18).

55. Defendant Hedlund did not see Paxton Williams at the Capitol protests. (Hedlund Depo, p. 14, l. 5-7; App. 188).

56. Williams did not consume any alcohol, drugs, or any other illegal items prior to the demonstrations. (Williams Interrogatory No. 11, P. App. 15).

57. On May 30, 2020 and May 31, 2020, Paxton Williams did not participate in, or observe, any property destruction, vandalism, graffiti, or defacing of property. (Williams Interrogatory No. 20, P. App. 19).

58. Paxton Williams was standing in the entrance of his home, by himself, observing officers going down East Locust Street.  (Williams Interrogatory No. 12, P. App.16).

59. Paxton Williams intended to go inside after the officers passed, but was prevented from doing so when Officer Hedlund and other officers charged him, tackled him to the ground, pepper sprayed him, arrested him and took him to jail.  (Williams Interrogatory No. 12, P. App.16).

60. Defendant Hedlund was intending to spray Paxton Willaims before Williams ever said "fuck you."  (Williams Affidavit P. App. 11; Hedlund Depo. P. 17, l. 5-8, App. 191).

61. Defendant Hedlund testified that him raising his spray was "about simultaneously" with Williams saying "fuck you."  (Hedlund Depo. P. 17, l. 5-8, App.191).

62. The only thing Defendant Hedlund saw that he personally found offensive from Paxton Williams was that Williams was "clearly agitated with us and our presence of being there." (Hedlund Depo. P. 17, l. 22 – p. 18, l. 5; App. 192).

63. The response to Paxton Williams's complaint was not moved along the investigatory process until two days after he filed his civil complaint in Polk County District court.  (R. Doc. 1, p. 1).

64. On June 8, 2022, Defendant Jacob Hedlund exchanged text messages with Des Moines Senior Police Officer Adam Herman that said:

Hedlund:  Paxton Williams has officially sued me.

Herman:  That pussy.

Hedlund:  the filing says he can't walk to work without walking past the area that causes him great pain and suffering.

Herman:  Haha.

Hedlund:  😊

(P. App. 6).

7

65. The text messages on June 8, 2022 from Defendant Hedlund show that Defendant Hedlund and other employees of the Des Moines Police Department obtained pleasure from causing pain and suffering to Paxton Williams. (P. App. 6).

66. Defendant Jacob Hedlund and the Des Moines Police Department's public information officer, Paul Parizek exchanged text messages about Paxton Williams:

    Hedlund:  My video was on June 1st at 11:51 pm.

    Parizek:  Thanks.

    Parizek:  You remember that jackasses name?  I just had a convo with a buddy who has a connection to the Iowa Bar Assoc.

    Hedlund:  paxton williams

    Parizek:  Thanks

    Hedlund:  😊

    (P. App. 7).

67. The texts between Defendant Jacob Hedlund and Paul Parizek show that Defendant Hedlund, and the leadership within the Des Moines Police Department were discussing how to retaliate further against Paxton Williams for his complaint.  (P. App. 7).

68. On June 22, 2020, Defendant Jacob Hedlund and Des Moines Police Sergeant Mark McKinney also texted about Hedlund arresting the "assistant state ag" Paxton Williams.  (P. App. 3).

69. On Thursday, October 8, 2020, Defendant Hedlund texted back and forth with someone he had saved in his phone as "City Attormey" beginning at 3:31 P.M.,

    Hedlund: have you taken anyone's right to practice law away yet."

    "City Attormey":  Not yet, because of COVID stuff, I've only been to my new job a couple of times.  Working at my kitchen table most of the time.  Have they started traffic court yet or is that still on hold?

    Hedlund:  we are back in full swing.  Let me know if you have anything to do with Paxton Williams he is attorney that I arrested downtown during the "peaceful protest"

(P. App. 4-5).

70. The text communication between Hedlund and the person that he saved in his phone as "city attormey" who had control over attorneys' licenses is a clear indication that Defendant Hedlund was intending to retaliate with the help of other city employees against Paxton Williams for his complaint to the Des Moines Police Department by trying to impact his license to practice law.  (P. App. 4-5).

71. Even though Defendant Hedlund had multiple text messages about Paxton Williams with Des Moines Police leadership, including Senior Police Officer Herman, Sergeant Mckinney, Information Officer Paul Parizek, and the former "City Attormey," and even though Hedlund was trying to have someone retaliate against Williams's law license on his behalf, (P. App. 3-7), Hedlund later testified, under oath, that he only had conversations with Sergeant Robinson, Sergeant Frentress, and Lieutenant Seybert about Paxton Williams.  (Hedlund Depo. p. 30-31 App. 30).

72. As a result of Defendants' actions, Paxton Williams suffered not only physical and emotional distress damages, but he also felt like he could no longer participate in National Bar Association activities, or continue his work on an Iowa PBS documentary.  (Williams Interrogatory No. 16, P. App. 17).

73. Defendant Hedlund has had two prior complaints against him for using excessive force. (Hedlund Depo. p. 32-34, App. 206-208).

74. An independent expert in police procedures, Roger Clark, (Clark Resume P. App. 21), opined, "It cannot be overstated at this point in my report that the use of force and arrest occurred in the entryway to his personal residence."  (Clark Report, p. 6, P. App. 33).

75. Roger Clark further opined,

> Accordingly, the arrests, the force used against the protesters, and the prolonged pursuit of criminal charges against the protesters generally and in particular to Mr. Williams, worked to chill their desire to protest and have their voices heard. In my opinion, the excessive and unnecessary force inflicted by the Defendant Officers was not warranted given the facts as documented and were in violation of professional standards, policy and law (as trained).

(Clark Report, p. 6, P. App. 33).

76. Roger Clark further opined pursuant to his detailed report, that Mr. Wiliams had not been given a lawful and reasonable order to disperse, and even if he had, "the force and arrest inflicted on Mr. Williams was excessive and unnecessary and in violation of his Constitutional rights (as trained). (Clark Report, p. 8, P. App. 35).

77. Roger Clark further opined,

> Mr. Williams offered no resistance whatsoever. He was not engaged in criminal conduct, he was simply standing alone at the entry to his residence. He was willing to comply with every verbal order. In particular, I saw nothing in the record to necessitate any use of impact munitions or physical force or chemical agents on Mr. Williams.

(Clark Report, p. 8-9, P. App. 35-36).

78. Trudy Paulson who was not present at the arrest of Paxton Williams, signed and filed the criminal complaint against Paxton Williams without even first speaking with the arresting officer, Defendant Hedlund, which was atypical of how criminal complaints are usually handled. (Hedlund Depo, p. 38, l. 5 – p. 39, 8, App. 212-213).

79. Jacob Hedlund did not see Trudy Paulson's criminal complaint she filed before she filed it, and agreed that he knew that multiple, material portions of it were not true at the time it was signed and filed by Trudy Paulson. (Hedlund Depo. p. 41 – 47, App. 215-221).

80. Jacob Hedlund admitted that the following statements in the criminal complaint against Paxton Williams were not true and he knew they were not true at the time Trudy Paulson filed the complaint:

(1) That Paxton Williams was homeless. (Hedlund Depo, p. 41, App. 215).

(2) That Paxton Williams caused property damage. (Hedlund Depo. p. 42-43, App. 216-217).

(3) That Paxton Williams obstructed public roadways. (Hedlund Depo. p. 43, App. 217).

(4) That Paxton Willaims engaged in violent, intimidating, and destructive behavior. (Hedlund Depo. p. 43, App. 217).

(5) That Paxton Williams was present during the "total of five times over a period of 20 minutes" when a command to disperse was read at the capitol. (Hedlund Depo. p. 43, App. 217).

(6) That Paxton Willaims was around people who were engaging in assaultive conduct. (Hedlund Depo. p. 44, App. 218).

(7) That Paxton Williams destroyed property. (Hedlund Depo. p. 44, App. 218).

(8) That Paxton Williams damaged public buildings and private businesses. (Hedlund Depo. p. 44, App. 218).

(9) That Paxton Williams threw water bottles. (Hedlund Depo. p. 44, App. 218).

(10) That Paxton Williams "willfully stayed among the group that remained" at the Capitol after being told to disperse. (Hedlund Depo. p. 44-45, App. 218-210).

(11) That Paxton Williams willfully remained among a group of persons responsible for open, extensive and obvious destructive conduct. (Hedlund Depo. p. 45, App. 219).

81. Despite there being false statements in the criminal complaint against Paxton Williams, Defendant Hedlund did nothing to fix the statements. (Hedlund Depo. p. 47, App. 221).

82. Defendant Hedlund admitted that he authored a supplemental report against Paxton Williams, and chose to put "riotting" [stet] in box 6 of the report that asked for the "correct offense or incident classification" even though he had not seen any evidence of Paxton Williams rioting. (Hedlund Depo., p. 50, App. 224; Supplemental Report, App. 153).

83. Defendant Hedlund claimed under oath first that Williams refused to "move" when given the command, but then also claimed that Williams was "running away." (Hedlund Depo., p. 51-52, App. 225-226).

84. Defendant Hedlund had previously stated in a recording that Williams was not running away, but instead described that Williams turned away from him when he was about to mace him, but that he could not have gotten away from officers anywhere because he was in a fenced in area.  (P. App.45).

85. Defendant Hedlund testified that Paxton Williams did not throw bricks, rocks, water bottles, milk jugs, or bottles of urine at him.  (Hedlund Depo., p. 70, App. 255).

86. Defendant Hedlund has never stated, or testified, that one of the reasons he arrested, or sprayed, Paxton Williams for being in violation of a curfew.  (Hedlund Depo. App. 157-248; P. App. 45).

87. Defendant Robison said that he typically recorded calls, but claimed not to know if his call to Paxton Williams was recorded.  (Robinson Depo., p. 22, App. 278).

88. Defendant Hedlund was promoted, not reprimanded, after assaulting Williams, and despite Willaims's complaint for excessive force.  (Hedlund Depo. p. 59, App. 233).

        Respectfully Submitted,

        /s/Angela L. Campbell
        /s/Jacob M. Oeth
        Angela L. Campbell AT# 0009086
        Jacob M. Oeth AT#0013814
        DICKEY, CAMPBELL & SAHAG LAW FIRM, P.L.C.
        301 E. Walnut St., Suite 1
        Des Moines, Iowa 50309
        PHONE: 515.288.5008
        FAX: 515.288.5010
        E-MAIL:  angela@iowajustice.com
                  jake@iowajustice.com
        ATTORNEYS FOR PLAINTIFF

**Service to:**

Michelle Mackel-Wiederanders
Luke DeSmet
Assistant City Attorneys
mrmackel@dmgov.org
lmdesmet@dmgov.org
**ATTORNEYS FOR DEFENDANT**

PROOF OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon each of the attorneys of record, or the parties if unrepresented, at their respective addresses disclosed on the pleadings.

By:    _____ U.S. Mail            _____ Fax
       _____ Courthouse Mail      _____ Hand delivered
       _____ Certified Mail         x   Other (CMECF)

Signature: _____/s/Angela L. Campbell_____

Date: ___8/3/2023_____

13