## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| PAXTON WILLIAMS, | * | CIVIL NO. 4:22-cv-00240-SBJ |
| | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | **MEMORANDUM OPINION** |
| JOHN DOES 1-8, JACOB HEDLUND, | * | **AND ORDER ON** |
| TRUDY PAULSON, JEFF ROBINSON, | * | **DEFENDANTS' MOTION** |
| DANA WINGERT and CITY OF DES | * | **FOR SUMMARY JUDGMENT** |
| MOINES, IOWA, | * | |
| | * | |
| Defendants. | * | |
| _____ | * | _____ |

## I. INTRODUCTION

This case arose from protest activities in downtown Des Moines, Iowa in late May and early June 2020 in the aftermath of the death of George Floyd in Minneapolis, Minnesota. There were peaceful activities at certain times and locations but acts of violence and vandalism at certain times and locations. Several arrests were made by law enforcement officers. Several lawsuits were filed by individuals who were arrested. This is one of those cases.

On the night of June 1, 2020, Paxton Williams joined others marching in downtown Des Moines and to the Iowa State Capitol. He alleges the protest activities at the Capitol were peaceful until law enforcement officers became aggressive and used excessive force on protestors without justification. From law enforcement's perspective, force was necessary to disperse the large crowd which had gathered in violation of a county curfew and refused to leave after dispersal orders had been given. Williams eventually returned to the entryway of his residence in a downtown building and watched as other people from the Capitol passed by on the street followed by law enforcement officers in riot gear. All within a matter of seconds, officers yelled at Williams to "move" to which he responded with profanity as officers approached him, he was pepper-sprayed, tackled to the

ground, and arrested for failure to disperse under Iowa statutory law.

Williams subsequently brought this action against several defendants: City of Des Moines, Iowa; Jacob Hedlund who was employed as a law enforcement officer with the Des Moines Police Department at the relevant time; Trudy Paulson who was employed at the time as a Des Moines police officer; Jeff Robinson who was employed at the time as a Des Moines police sergeant; Dana Wingert who was employed at the time as the Des Moines Chief of Police; and unidentified John Does 1-8 who are believed to be employed as Des Moines police officers. Officer Hedlund was the officer who pepper-sprayed, tackled, and arrested Williams. Officer Paulson prepared and signed a criminal complaint against Williams after his arrest. Sgt. Robinson spoke with Williams and conducted an investigation after he submitted an on-line complaint with the Police Department.

Williams alleges he was arrested and charged without probable cause in violation of protected rights under the United States Constitution and the Iowa Constitution. He further alleges excessive force was used during the arrest, defendants' actions were in retaliation for exercising his constitutional rights, defendants' actions were a result of deliberately indifferent policies, practices, customs, training and supervision, and defendants conspired to violate his constitutional rights. Williams also asserts claims under Iowa state common law for intentional infliction of emotional distress, false arrest/imprisonment, malicious prosecution, and assault and battery.

Now before this Court is a Motion for Summary Judgment (Dkt. 26) filed by defendants pursuant to Federal Rule of Civil Procedure 56. Defendants assert there was probable cause to arrest and charge Williams and the force used was reasonable. Defendants further assert they did not act in retaliation nor conspired to violate Williams' constitutional rights nor had deliberately indifferent policies, practices, customs, training and supervision. They also assert entitlement to qualified immunity as to claims under the United States Constitution. As for claims under the Iowa

Constitution, defendants contend such claims cannot proceed given the Iowa Supreme Court's decision in *Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023) which was issued after this case was initiated. Defendants also challenge the viability of the claims asserted under Iowa state common law and contend the unidentified John Does 1-8 should be dismissed. Finally, Officer Hedlund contends he is immune from liability on common law tort claims under Iowa Code § 670.4(1)(k) for actions he took in response to an emergency.

Williams resists the motion as to certain claims insisting there was no probable cause to arrest him and the use of force during his arrest was excessive. Dkt. 37. Williams further contends none of the defendants are entitled to qualified immunity. In Williams' view, there are material questions of fact which prohibit summary judgment on any of the federal constitutional or state tort claims. Williams concedes the claims brought under the Iowa Constitution should be dismissed given the Iowa Supreme Court's decision in *Burnett*. Williams also agrees that dismissal against the unnamed John Does 1-8 is appropriate. Otherwise, Williams maintains the remaining claims should proceed to a jury trial.

Oral arguments were presented by counsel. The Court considers the matter to be fully submitted. For the reasons which follow, the motion is granted in part and denied in part.

## II. WILLIAMS' ALLEGATIONS AND CLAIMS

Williams is an African-American United States citizen who was a resident of Des Moines, Iowa and employed as an attorney for the State of Iowa at the time of the events. Dkt. 20 ¶¶ 1, 18. As alleged in his Second Amended Petition at Law, in the evening of June 1, 2020, Williams "watched a protest march from the living room window of his home at 400 E. Locust St. in Des Moines." *Id.* ¶ 14. He "was aware of the racial justice protests and marches that were inspired by the murder of George Floyd in Minneapolis." *Id.* ¶ 15. He "left his home and joined the march as it headed west on Locust St." *Id.* ¶ 19. He "marched with the group of marchers throughout

downtown Des Moines and then to the Iowa State Capitol." *Id.* ¶ 21. He describes the protest at the Capitol as "overwhelmingly peaceful" but alleges law enforcement officers became aggressive and used force without justification. *Id.* ¶¶ 23-31.

Williams "ran" back to the entryway of his residence where he watched protestors pass by on the street away from the Capitol. *Id.* ¶¶ 32-33. Law enforcement officers dressed in riot gear then came down the street. *Id.* ¶ 36. As described by Williams, "[l]aw enforcement officers, including Defendant Jacob Hedlund, ran towards [him], pepper-sprayed him (or sprayed him with whatever harmful chemical it is they had), and they forcefully tackled [him] to the ground. *Id.* ¶ 42. Williams alleges he "was never given a chance to submit to arrest and avoid being sprayed and tackled." *Id.* ¶ 43. He "was arrested and issued a citation for failure to disperse" signed by Defendant Trudy Paulson. *Id.* ¶¶ 50, 52. Williams was transported to Polk County Jail and spent the night incarcerated. *Id.* ¶ 58.

Based on those and additional factual allegations, Williams asserts thirteen causes of action. Counts 1 and 2 assert claims against the City of Des Moines, Hedlund, and Paulson for illegal seizure in violation of the Fourth Amendment to the United States Constitution and Article I, section 8 of the Iowa Constitution. *Id.* ¶¶ 81-101. Counts 3 and 4 assert claims against the City of Des Moines and Hedlund for using excessive force in violation of the Fourth Amendment to the United States Constitution and Article I, section 8 of the Iowa Constitution. *Id.* ¶¶ 102-23. Counts 5 and 6 assert claims against the City of Des Moines, Robinson, and Wingert for retaliation in violation of the First Amendment to the United States Constitution and Article I, section 7 of the Iowa Constitution. *Id.* ¶¶ 124-55. Counts 7 and 8 assert claims against the City of Des Moines and Wingert for deliberately indifferent policies, practices, customs, training and supervision in violation of multiple amendments to the United States Constitution and articles of the Iowa Constitution. *Id.* ¶¶ 156-82. Count 9 asserts claims against the City of Des Moines, Robinson, and

Wingert for conspiracy in violation of multiple amendments to the United States Constitution. *Id.* ¶¶ 183-92. Count 10 asserts state law claims of intentional infliction of emotional distress against "all defendants." *Id.* ¶¶ 193-205. Count 11 asserts state law claims of false arrest/imprisonment against the City of Des Moines, Hedlund, and Paulson. *Id.* ¶¶ 206-13. Count 12 asserts state law claims of malicious prosecution against the City of Des Moines, Hedlund, and Paulson. *Id.* ¶¶ 214-23. Count 13 asserts state law claims of assault and battery against the City of Des Moines and Hedlund. *Id.* ¶¶ 224-32.

Williams claims he was injured by defendants' alleged illegal conduct and seeks "actual, compensatory, consequential, and all other allowable damages," "compensation for violation of his constitutional rights, mental anguish, and humiliation," and punitive damages. *Id.* ¶¶ 9-10, 12-13, 15, 17, 19, 21-27. Williams also seeks recovery of his costs in this action including reasonable attorney's fees. *Id.*

In a responding answer, defendants deny the majority of Williams' allegations including his claims for relief. Dkt. 21. Defendants also assert several "affirmative defenses" including as follows:

> Plaintiff has failed to state a claim upon which relief may be granted.

> Defendants are not liable under 42 U.S.C. § 1983 because their actions were constitutional.

> The actions of Defendants were, at all times, justified, necessary, carried out in good faith and with sufficient legal cause, and in conformity with settled principles of constitutional or other law.

> Defendants have not violated any of the Plaintiff's First, Fourth, Fifth, or Fourteenth Amendment rights.

> Defendants have not violated any of the Plaintiff's rights under the Iowa Constitution.

> There was probable cause for Plaintiff's arrest.

Defendants did not engage in excessive force, malicious prosecution, false arrest or assault and battery.

Defendants at all times were motivated with neither an evil intent or motive, nor a reckless or callous indifference, toward any of Plaintiff's rights.

Defendant City of Des Moines is not liable in respondeat superior, nor in a *Monell* capacity.

Defendant City of Des Moines cannot be found liable for punitive damages.

The Defendants are immune pursuant to Iowa Code Chapter 670.

The individual Defendants have qualified immunity.

*Id.* pp. 16-17.

Both Williams and defendants demand a trial by jury on all claims. Dkt. 20 p. 27; Dkt. 21 p. 17.

### III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56. Dkt. 26. As set forth in their supporting memorandum, defendants contend as follows:

The Court should grant summary judgment to the City and all defendants on Mr. Williams's claims. The arrest of Mr. Williams was warranted both because he was in violation of the Polk County curfew in place on June 1, 2020 and because Officer Hedlund had probable cause to believe Mr. Williams was guilty of failing to disperse. Given the riot conditions that were present at the Iowa State Capitol and had passed Mr. Williams's location only minutes before his arrest, the use of force against him was reasonable to effect his arrest. The probable cause for arrest defeats several of Mr. Williams's other claims as well. Ultimately, the record shows that Mr. Williams cannot prevail on any claims.

Dkt. 31 p. 2. Defendants continue within the memorandum raising various challenges to Williams' multiple claims. *Id.* pp. 7-47.

Except as to the claims against the unidentified John Does 1-8 and the claims under the Iowa Constitution, Williams resists the motion contending there are material questions of fact

which prohibit summary judgment on the federal constitutional and state tort claims. Dkt. 37. Williams insists there was no probable cause to arrest him and the use of force during his arrest was not reasonable. *Id.*

### III. STANDARDS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial responsibility of identifying evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 324).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, the court's function is not to determine credibility, weigh the evidence or determine the truth of the matter. *Id.* at 249, 255. Instead, the court views the record in the light most favorable to the nonmoving party and determines whether there is a genuine issue for trial. *Id.*; *see also Torgerson*, 643 F.3d at 1042.

## IV. EVIDENTIARY RECORD OF FACTS

In support of their motion, defendants submitted a fairly substantial evidentiary record including video from a body camera worn by Officer Jacob Hedlund when he interacted with Paxton Williams. Defendants also submitted transcripts of law enforcement radio dispatches, transcripts of deposition testimony, and other various documents including police documents related to Williams' arrest. Williams submitted a personal sworn affidavit, transcript of his deposition testimony, and portions of his discovery responses along with portions of text messages by Officer Hedlund. Both sides submitted reports from individuals designated as expert witnesses. The Court has reviewed all the materials and summarizes the facts from therein, some of which the parties dispute and have divergent views.

Following the death of George Floyd in Minneapolis, Minnesota, various protest activities occurred in multiple locations in downtown Des Moines, Iowa in late May and early June 2020. On the night of June 1 into the morning of June 2, 2020, Des Moines experienced a fourth consecutive night of protests. At times during the protests, a variety of objects were thrown at Des Moines police officers including bricks, rocks, and water bottles. In addition, there was property damage and looting in the downtown area including broken windows to businesses and damage to courthouses.

On May 31, 2020, the Board of Supervisors for Polk County, Iowa adopted a resolution

establishing an emergency curfew in the county which includes the City of Des Moines. The emergency curfew order was adopted "as a result of violent protests that took place on May 29 and 30." Dkt. 26-2 p. 23. As stated in the resolution, "civil unrest and public disorders has resulted in substantial interference with the public peace and there exists an immediate threat to the health and safety of the people and property of Polk County." *Id.* p. 24. The curfew order was enacted under Iowa statutory law and required all individuals located in Polk County to "remain in their place of residence during the hours" of 9:00 p.m. to 5:00 a.m. unless travelling to or from work, for medical assistance or family emergency, or for religious observance. *Id.* p. 25. The curfew order further provided:

> Polk County, Iowa authorizes any peace officer employed thereby, when in full and distinctive uniform or displaying a badge or other insignia of authority, to arrest without warrant any person violating or attempting to violate this Curfew Order in that officer's presence.

*Id.* p. 26.

Paxton Williams had seen the video of George Floyd's death and believed it was a racially motivated murder. He resides on the second floor of a building at 400 East Locust Street in Des Moines, Iowa. On the early evening of June 1, 2020, he watched a protest march from his living room window. Williams left this home and marched with others throughout downtown Des Moines and to the Iowa State Capitol. As explained in an affidavit, Williams did so "as a support for racial justice and to observe and bear witness to the actions taking place." Dkt. 37-3 pp. 8-13, ¶ 8. He further explained during his deposition:

> [T]his was in the height of what I would say was awareness of just a heaviness about George Floyd and racial injustice.
>
> I also was aware of reports of what I would--I mean what I would say was bad action, bad acting by the cops. You know, I know the Andrea Sahouri matter, I was aware of that.
>
> So I thought I'm going to go and witness and judge for myself to see both what the

crowd's doing, what law enforcement's doing, A, so could I make my own judgment about what I'm hearing, and then also I believe in racial justice, and so I wanted to show support for the people who were taking their time to go and march in support of that.

Dkt. 43 p. 21. During the march, Williams "was wearing a mask and glasses because of COVID." Dkt. 37-3 pp. 8-13, ¶ 6. As he explains, "[i]t was common practice for [himself], and others, at the time to wear masks and eye coverings out in public because of COVID." *Id.* ¶ 7. At some point, Williams ran into a work colleague during the march. Dkt. 43 pp. 24, 27.

A crowd gathered at the Iowa State Capitol the night of June 1st. Groups left the area for a period of time and around 10:30 p.m. groups headed back to the Capitol. It was reported over police radio that there were weapons and guns in the crowd. Around 10:40 p.m., a crowd was approaching the west side of the Capitol. At the same time, other groups were travelling the downtown area creating concern for law enforcement including a group of young men travelling with blacked out vehicles. About 10:46 p.m., officers found windows in the downtown area broken.

Around 11:00 p.m., a crowd was marching up the steps toward the Capitol. By 11:02 p.m., the crowd was close to the Capitol, and community ambassadors were trying to encourage people to leave. Additional officers were directed to the area. Additional groups also were headed toward the Capitol around 11:05 p.m. and law enforcement continued directing additional units to the area. There were approximately 200 people in the crowd at the Capitol.

Around 11:18 p.m., officers were asking the crowd to leave explaining it was 2 hours past curfew. They were directed to travel north or south, not west. At 11:26 p.m., it was reported over police radio that water bottles were being thrown at an armored law enforcement vehicle. At 11:28 p.m., officers reported having water bottles and other "shrapnel" being thrown at them. At 11:29 p.m., it was reported that community ambassadors had failed to get the crowd to disperse and that

officers would be reading dispersal orders soon.

Five dispersal orders were read using sound amplification at the Capitol between 11:31 p.m. and 11:43 p.m. The dispersal orders utilized the following script:

> I am __ and I represent the __ Department. Your conduct is in violation of Iowa Code Section 723.2, Unlawful Assembly. I command you in the name of the People of the State of Iowa to disperse, and if you do not, you shall be arrested for Violation of Iowa Code Section 723.2, Unlawful Assembly, and Iowa Code Sections 723.3, Refusal to Disperse.

Dkt. 26-2 p. 33.

At 11:33 p.m, it was reported that about a third of the crowd had left after the first dispersal order and the order was being read a second time. Around 11:37 p.m., it was reported that large groups were heading west on Court Avenue and Walnut Street. A remaining crowd at the Capitol did not leave. At 11:43 p.m., law enforcement officers at the Capitol were authorized to move forward to move people off the grounds and arrest anyone who was still in the area.

By 11:44 p.m., one group of about 100 people heading west had reached the intersection of East Fourth Street and Walnut Street. At the same time, law enforcement officers at the Capitol were working to push people off the grounds before deploying tear gas. State of Iowa officers deployed tear gas at 11:45 p.m.

At 11:46 p.m., it was reported that part of the group that had been travelling west on Walnut Street had gone north on East Fourth Street and was heading back east on Locust Street. The group continued east on Locust Street for several minutes. By 11:49 p.m., officers were being ordered to reassemble near the Capitol for another group. At 11:50 p.m., it was reported that the Capitol grounds were cleared.

Williams estimates he arrived at the Capitol along with his work colleague "[a]nywhere from 8:00 to 9:00." Dkt. 43 pp. 26-27. They were closer to the front of the crowd and watched "a lot of speeches." *Id*. p. 28. From his perspective, as set forth in his affidavit, the protest at the

Capitol "was overwhelmingly peaceful" until law enforcement became aggressive:

> The protest at the Capitol was overwhelmingly peaceful.
>
> The speakers and members of the protest crowd loudly and fully condemned the one instance of someone throwing a water bottle toward law enforcement officers.
>
> I observed law enforcement officers become aggressive without cause and engage in reckless, harmful, and unconstitutional activity.
>
> I observed law enforcement officers at the Capitol intentionally using force on peaceful protestors with no lawful justification.
>
> I observed law enforcement officers at the Capitol knowingly placing protestors in physical danger through indiscriminate use of excessive force.
>
> I observed individuals hit by flashbangs, use of tear gas and officers firing other weapons indiscriminately into crowds of peaceful protestors starting before 11:45 p.m.
>
> I observed law enforcement officers run towards and push bicyclists who were trying to leave the Capitol area on their bikes.
>
> I observed excessive use of force injure protestors, journalists, and bystanders.
>
> I observed law enforcement's wrongful actions chilling individuals from exercising their First Amendment rights.
>
> I was shocked by what I observed from law enforcement officers on June 1, 2020, including the violence that was instigated by, and escalated by, the officers chasing individuals and using weapons on peaceful protestors.

Dkt. 37-3 pp. 8-13, ¶¶ 9-18. Williams further explains his observations during his deposition. Dkt. 43 pp. 30-31, 40-45, 47-52. Defendants dispute Williams' descriptions and perceptions of the events at the Capitol. Dkt. 55 ¶¶ 7-16.

As further explained by Williams, he "ran away from the bedlam and violence caused by the actions of law enforcement." Dkt. 37-3 pp. 8-13, ¶ 19. He "was not told personally by any police officer to leave the Capitol at any time on June 1, 2020." *Id.* ¶ 20. When asked during his deposition whether he heard any dispersal orders at the Capitol, he responded: "I can't say if I did or I didn't. I mean I was there, yeah, but I can't recall hearing . . . I can't say I heard any dispersal

orders." Dkt. 43 pp. 34-35. Williams remembers "law enforcement talking . . . [but didn't] know necessarily all the content of what they were saying." *Id.* p. 35.

Williams was also unable to recall the exact time he left the Capitol but noted he and his work colleague left together and walked and "talked a little bit' until they separated when the colleague "went to go to his car to go home, and then I walked home." *Id.* pp. 32, 34. It would normally take 10 to 15 minutes to walk from the Capitol to his residence a few blocks away. *Id.* p. 33. He does not know specifically how long it took the night of June 1st and testified "[i]t's tough to gauge." *Id.* pp. 48, 109.

In his affidavit, Williams states when he left the Capitol he "was not travelling with any particular group, [he] was returning to [his] home at 400 East Locust Street." Dkt. 37-3 pp. 8-13, ¶ 21. He "stopped at the entryway of [his] home . . . and watched injured individuals running from the law enforcement officers run by my home." *Id.* ¶ 22. Williams "was alone in front of [his] home . . . when law enforcement officers, dressed in riot gear, approached the entryway." *Id.* ¶ 23. According to Williams, "[a]ll the people [he] saw were running or moving to get away from the officers." Dkt. 43 p. 100. Williams does not know how long he stood there before officers arrived and again testified it was "[t]ough to gauge." *Id.* pp. 49, 109.

Officer Jacob Hedlund worked each night of the protests and was one of the officers working to push crowds away from the Capitol the night of June 1st. He has been employed by the City of Des Moines as a police officer since December 2007. He attended the Des Moines Police Academy and received over 800 hours of training. At the time of the protests, he was assigned to the traffic unit typically working from noon until 8:00 p.m. He was also a member of the Metro STAR team that receives specialized training to execute warrants and other high-risk activities. Metro STAR officers come from different law enforcement agencies in the area and are on call to respond as necessary. They attend two days of training each month. In the year prior to

the arrest of Williams, Officer Hedlund had undergone 53 hours of training on various topics.

According to Officer Hedlund, the four nights of protests were "chaotic" and different than any prior experience as a police officer, noting "the level of chaos, the level of hatred towards law enforcement, things being thrown at us, the violence that the community was showing towards us." Dkt. 26-2 p. 219. He had been "hit with bricks, rocks, water bottles, a full milk jug, bottles of urine." *Id.* When people were told to disperse: "Sometimes they would. Sometimes they didn't." *Id.* p. 220. Crowds would disperse and then regroup:

> Multiple times we would set up at a location to either protect property or, you know, businesses, and we would deploy, you know, tear gas or OC spray to disperse the crowd at which point they would kind of break off into little clusters. And then those small clusters seemed to typically regroup to form one large group.

*Id.* p. 221.

On the night of June 1st, Officer Hedlund was deployed as part of the Metro STAR team to respond to the protests in downtown and at the Capitol. At 11:51 p.m., he was on foot with the other officers moving west on Locust Street just past the intersection with East Seventh Street. They were wearing gas masks, helmets and had shields. As explained by Officer Hedlund, the team's "job was to clear the streets and to make sure that protesters were complying with the orders to leave and disperse when given those orders." *Id.* p. 204.

By 11:54 p.m., the officers had reached the corner of East Sixth Street where Officer Hedlund directed a vehicle to turn around and leave. At 11:55 p.m., it was reported a crowd was again heading west on Locust Street and had reached the intersection at East Fifth Street. Officer Hedlund reached the intersection by 11:56 p.m. Due to the radio traffic, Officer Hedlund was aware of the crowd moving down Locust Street and past East Fourth Street.

Officer Hedlund continued west on Locust Street with other officers. As depicted on video from his body camera, an individual ran out from an alcove between businesses at 424 East Locust

Street and passed Williams standing at 400 East Locust Street. Officer Hedlund observed Williams standing alone on the sidewalk wearing safety glasses, yelling in the direction of the officers, and raising his hands toward them. He had not seen Williams at the Capitol or earlier in the night. From Officer Hedlund's perspective, Williams "was clearly agitated with us and our presence of being there." *Id.* pp. 173-74.

Williams explained during his deposition after reviewing the body camera video that "I think I was saying 'disgraceful.' I think you can hear me say 'disgraceful,' yeah. I think that's the word that I could most make out. . . . I maybe said 'disgraceful' more than once . . . and I think that's when I pointed at my residence." Dkt. 43 pp. 102-03.

The parties dispute whether the body camera video depicts Williams "standing at the edge of the sidewalk and buildings" as asserted by defendants or "standing off of the sidewalk, inside an alcove, in front of a gate that lead to his home" as asserted by Williams. Dkt. 56 ¶ 75. Williams acknowledged during his deposition that anyone from the public could be in that location. Dkt. 43 p. 104. But according to Williams, he "was in the alcove . . . not on the sidewalk that goes in front of the buildings." *Id.* p. 112. He testified the alcove is a private space owned by a homeowner association of which he is a member of and pays fees for as a resident of the building. *Id.*

Officer Hedlund could not tell what Williams was yelling but responded saying "You'd better move!" Several other officers shouted "Move!" as well. Officer Hedlund told other officers "We're going to go in on him if he doesn't f***ing move." The officers again told Williams to move. Williams shouted "F*** you!"

According to Williams, he "was not given an order to disperse while at [his] residence" and "was not asked to return inside [his] residence." Dkt. 37-3 pp. 8-13, ¶¶ 24-25. He further notes he "was not asked if [he] lived at the address where [he] was standing." *Id.* ¶ 26. As explained by Williams: "[w]hen officer[s] yelled at me to move, I pointed to my home and indicated I lived

here, twice." *Id.* ¶ 27. He further explains:

> When officers continued to advance on me even though I had said in a calm voice and gestured that I lived here, and continued to yell "move," I backed up quickly towards the gate to enter my residence . . . . I did not turn my back on the officers, even though I was backing up because I was scared of them, due to what I had seen them do to other innocent people that evening.

*Id.* ¶¶ 28-29.

At 11:57 p.m., Officer Hedlund approached Williams, deployed pepper spray, and tackled him to the ground. When asked to explain his actions, Officer Hedlund testified as follows:

> Because at that point, we had given him instructions to leave the area, move, and he was refusing to do so. So if he -- if we walk past -- and walk past him, then he would be behind us, which would then pose a danger -- or could pose a danger to myself and the rest of my team.
>
> \* \* \*
>
> . . . [A]t that point in time, he was resistive towards us. He had yelled profanities in our direction, and in my opinion was aggravated and not willing to comply with orders given to him.
>
> \* \* \*
>
> He was failing to disperse when we told him he needed to move, he needed to leave.

Dkt. 26-2 pp. 172, 174-75, 179. Officer Hedlund ordered Williams to give him his hands, and Williams complied. Zip-tie cuffs were used to secure Williams' hands.

According to Williams, he "was never given a chance to submit to arrest and avoid being sprayed and tackled":

> I did not flee from officers, but moved backwards towards the locked gate when I was told by the officers to move. Defendant Jacob Hedlund ran towards me and sprayed me in the eyes with a harmful chemical, which immediately caused me to buckle to my knees and caused me immense pain. I did not yell "f\*\*\* you" at the officers until after it was obvious that they were going to spray me in the face regardless of the fact that I was moving backwards as ordered, just as they had done to other innocent people that night. . . . I was afraid for my life when I was sprayed in the eyes and tackled without warning.

Dkt. 37-3 pp. 8-13, ¶¶ 33-35, 37.

Williams was escorted to a police vehicle then searched. Williams asked why he was detained, and Officer Hedlund responded that "I told you to leave, and you wanted to run your

mouth." Officer Hedlund notified dispatch that he needed a transport wagon. He then asked

Williams if he was hurt and proceeded to rinse Williams' eyes with water. Williams said it helped

his eyes feel a little better. Williams was asked to identify himself, to which he responded:

> My name is Paxton Williams. P-A-X-T-O-N. I'm an assistant attorney general for the State of Iowa. My address is 400 East Locust. I was at my home! I was at my home, a few moments ago, when I was sprayed with this stuff in my eyes! When I was tackled! Google me!

At 12:04 a.m., Officer Hedlund helped transfer Williams to a wagon for transport. Officer Hedlund

gave other officers information that he was the arresting officer and Williams had been arrested

for failure to disperse.

During his deposition, Officer Hedlund was asked what Williams did to fail to disperse to

which he responded:

> He was in the area of three or more persons actively participating in a protest, unlawful assembly at which point we gave him instructions to leave the area and he refused to do so.

Dkt. 26-2 p. 180. When asked to identify the other persons, Officer Hedlund answered: "The large

group that had gone down that direction. . . . Westbound on Locust. . . . I believe at one point Mr.

Williams was involved . . . in that large group." *Id.* pp. 180, 198. Officer Hedlund further testified

that, at the time of Williams' arrest, he did not realize Williams was standing in front of his

residence. *Id.* pp. 177-78, 182, 222. Asked in hindsight where Williams should have gone, Officer

Hedlund responded:

> Well, in the totality of everything that we know, Mr. Williams was told "leave, move." He was right at his house. He could have very easily walked into -- through the common area foyer and into his residence. Had he done that, this would not have happened.

*Id.* p. 179. Officer Hedlund believes Williams was the only person he arrested that evening and

had arrested 5 or 6 persons total during the protests. *Id.* pp. 185, 210.

Williams was taken to an arrestee processing location set up during the protests. Police

Officer Trudy Paulson prepared and signed a criminal complaint form for the arrest of Williams. Officer Paulson was not present at the arrest of Williams nor spoke to Officer Hedlund directly about the arrest. Officer Hedlund did not see the criminal complaint before it was submitted. As explained by Officer Hedlund, "typically" the arresting officer fills out the information in a criminal complaint form and submits it electronically for a supervisor to approve then forward to the county attorney's office. *Id.* p. 194.

The criminal complaint submitted by Officer Paulson listed Williams' address as "HOMELESS", indicated race as "UNKNOWN", and described the crime as "FAILURE TO DISPERSE", a simple misdemeanor under Iowa law, occurring at "400 E LOCUST" in Des Moines on June 1, 2020, at the time of "23:48." *Id.* p. 133. The complaint set forth the following narrative:

> Defendant was a member of a group (of WELL over three people) that assembled to protest allegations of racism and police brutality. The protests evolved to property damage and obstruction of public roadways, with many of the remaining participants engaging in violent, intimidating and destructive behavior.
>
> Police officers clearly, loudly and repeatedly instructed all participants to disperse intermittently a total of 5 times over a period of approximately 20 minutes, reading a command to disperse as written in the state code of Iowa.
>
> Despite those instructions, Defendant willfully stayed among the group that remained. This group was engaging in assaultive conduct, the intimidation of people and destruction of property. Private businesses and public buildings were damaged by breaking windows. Water bottles and other objects were thrown at individuals.
>
> This destruction was open, extensive and obvious, yet the defendant willfully remained among the group of persons responsible for this conduct all of which occurred in the City of Des Moines, Polk County, Iowa.
> Defendant was within hearing distance of the commands to disperse and failed to leave.

*Id.* Officer Paulson signed the complaint under an affidavit which stated, in part: "I, the undersigned, being duly sworn, state that all facts contained in this Complaint and Affidavit,

known by me or told to me by other reliable persons form the basis for my belief that he defendant

committed his crime." *Id.* p. 134. During his deposition, Officer Hedlund acknowledged certain

portions of the criminal complaint were incorrect. *Id.* pp. 200-03. An Assistant Polk County

Attorney completed a Preliminary Complaint Review approving the charge of failure to disperse.

*Id.* p. 132.

Officer Hedlund prepared a Supplemental Report dated June 1, 2020 which listed

"Riotting" [sic] within a box on the form for "Correct offense or Incident Classification." *Id.* p.

135. Officer Hedlund set forth the following narrative:

> As a member of the Metro Star tactical unit I was dispatched to the area of the
> Capitol Building on a large crowd that was gathering and attempting to reach the
> Capitol Building during a protest. Members of the protest were given 5 commands
> and warnings to disperse from the Capitol Ground and to leave the area over a loud
> speaker. As multiple tactical unit began to attempt to disperse the crowd I was part
> of a team pushing the crowd west bound on Locust St. In the 400 block o [sic]
> Locust I observed a male standing on the sidewalk yelling in the direction of myself
> and multiple other officers. This male was outfitted with a mask and clear safety
> glasses that many protestors were wearing to combat OC Spray. As my team and I
> got closer to the male I gave multiple commands to leave the area, I also heard
> numerous other officers give commands to leave the area. The male did not move
> and continued to yell in our direction. I raised my OC spray canister and advised
> again to leave, the male still didn't leave. I then delivered a short burst of OC spray
> as I began running towards the male's direction but it did not appear to be affective
> [sic] and the male had tuned [sic] around to run away from me. I was able to deploy
> another short burst which did appear to be effective. I was able to catch the male
> and took him to the ground where he was placed into custody without further
> incident. I took the male back to our vehicle at which point I flushed his eyes out
> with a bottle of water. The male was turned over to a transport vehicle and was
> taken to PCJ.

*Id.* Officer Hedlund was asked during his deposition why he listed "Riotting" [sic], to which he

acknowledged he had not observed Williams rioting and explained:

> Essentially it was -- at that time we were just kind of -- the whole case was kind of
> lumped together as like the rioting incidents. It's not an actual – it's not like the
> charge that was filed. It's just pertaining to the riots.
>                                    * * *
> I didn't say that he was necessarily rioting at the time, but he was – it's the whole
> incident. It's a classification.

*Id.* p. 206.

Williams notes portions of the criminal complaint were not true, emphasizes he was alone at the time of his arrest, and maintains he was not committing any crimes when arrested by Officer Hedlund. As set forth in his affidavit, he "was not rioting on June 1, 2020," he "did not throw any objects at any Des Moines police officers," he "was not present when other individuals purportedly threw bricks, rocks, water bottles, full milk jugs, or bottles of urine at any Des Moines police officers," he "did not pose a threat to officers on June 1, 2020 or at any time," he "did not loot or create any property damage," he "was not present when any looting or property damage was occurring," he "did not have any weapons or guns" nor associated with anyone with weapons or guns nor saw anyone on June 1, 2020 with any weapons or guns except law enforcement officers. Dkt. 37-3 pp. 8-13, ¶¶ 39-44, 46-48. In his view, he "was arrested for 'running my mouth,' not for committing any crimes." *Id.* ¶ 45. Williams spent the night in jail and was bailed out by a nonprofit group.

On June 4, 2020, Williams completed an online complaint form with the Des Moines Police Department regarding his arrest. Dkt. 26-2 pp. 136-38. As to the "Nature of Complaint" Williams checked boxes for "Bias policing," "Inappropriate use of force," and "Violation of civil rights." *Id.* p. 137. Williams set forth his complaint as follows:

> I was standing in the entryway to my home when police officers walked by. The space is beyond the sidewalk away from the street and surrounded on three sides by my building. I was the only person there. They did not issue any order to disperse, they did not ask me to go home, they did not inquire if I lived there, and they did not ask me to go inside. As soon as they saw me, they ran towards me, pepper-sprayed me (or sprayed me with whatever it is they had), and they forcefully tackled me to the ground. I am still sore and aching now. They used so much pepper spray that I could not open my eyes during the ride to wherever I was first processed, and then I had to see the medic there to rinse out my eyes. They gave me no notice of what they were going to do and used excessive, unwarranted force. I request that any body camera footage from any of the involved officers be retained.

*Id.* p. 138.

The Department's Office of Professional Standards ("OPS") conducts investigations into officers after complaints are made. When OPS receives a complaint or concern from the public, it determines whether it is a simple matter that can be promptly resolved or if it is something that needs a file opened for investigation. Per policy, all complaints of racial bias or inappropriate use of force are investigated. When investigating such complaints, OPS has the complainant come in for a recorded interview to gather information. OPS then conducts recorded interviews with involved officers and citizen witnesses. OPS officers compile the materials relevant to the investigation including transcribed interviews, police reports, and videos. OPS officers do not make a determination about whether a violation has occurred. After OPS conducts the investigation, the gathered information is passed up the supervisor chain of command for review until the Chief of Police decides whether discipline is warranted.

Sgt. Jeff Robinson was assigned to the OPS at the time of Williams' arrest. He has been with the Des Moines Police Department for over 20 years, attended the Des Moines Police Academy, and receives yearly training. He received Williams' complaint which pursuant to policy required a mandatory investigation. He obtained and reviewed the supplemental report by Officer Hedlund and the body camera video of the arrest. He then contacted Williams by phone within hours after receiving the complaint.

According to Sgt. Robinson, the purpose of the call was to touch base with Williams and arrange a time for him to attend an in-person interview. *Id.* p. 260. During his deposition, Sgt. Robinson described the conversation as follows:

> We went over the incident. There was a few things I'm aware that he disagrees with, but we did discuss the fact that there was a video and at least a couple of discrepancies I wanted to clarify.

*Id.* p. 259. When asked what the discrepancies were, Sgt. Robinson noted Williams claimed "he wasn't given the warnings" but, in his view, "[t]he video supports the fact there were numerous warnings given." *Id.* Sgt. Robinson also noted, in his view, "[t]he video shows he was on the sidewalk or at least a common area" as opposed to private property. *Id.* The conversation lasted a few minutes and Williams agreed to come in for an interview which would be recorded. *Id.* p. 261.

According to Williams, Sgt. Robinson "did not say that there were 'some things' that were contradicted by the video of [his] arrest, but instead that the video 'refuted everything' in [his] complaint." Dkt. 37-3 pp. 8-13, ¶ 53. He believes "Sgt. Robinson was not truthful with [him] on the phone call because there was nothing in [his] complaint that was refuted by the body camera footage." *Id.* ¶ 56. He "understood Sgt. Robinson's phone call to be an attempt to intimidate [him] into withdrawing [his] complaint." *Id.* ¶ 55. During his deposition, Williams testified he "was probably just as shocked by that phone call as [he] was shocked by how they just ran at me and screamed and tackled me, because it makes no sense." Dkt. 43 p. 71.

Williams acknowledges they scheduled a time to meet, because he wanted to see the video, but he did not attend the interview. *Id.* pp. 72-73. He had no trust or faith in meeting with the police and did not want to "subject [himself] to additional trauma." *Id.* p. 73. An attorney representing Williams for the simple misdemeanor charge sent a letter to Sgt. Robinson dated June 5, 2020 cancelling the meeting set for that afternoon. Dkt. 26-2 p. 139.

Because it is mandatory, Sgt. Robinson proceeded with the investigation and interviewed two officers which were recorded including Officer Hedlund on June 30, 2020. Officer Hedlund explained he and about a dozen other officers were tasked with "forming a skirmish line and pushing the crowd" west bound down Locust Street "to get them to disperse." Dkt. 52 p. 3. He further indicated "multiple verbal commands" were given as they encountered people "to move . . . . they need to leave . . . they need to get out of the area." *Id.* p. 4. According to Officer Hedlund,

"for the most part [they] were able to gain compliance that way." *Id*. He described his interaction

with Williams as follows:

> So, my attention was, ah, initially drawn to him cuz as we started approach his
> location he was standing on the sidewalk, ah, pointing towards, um, the…the
> officers that were walking his direction, um, and was pointing at us…yelling at
> us…yelling profanities towards our direction. I don't remember exactly what he
> was saying . . . . He was acting aggressive towards us. Um, obviously had differing
> opinions on what we should be doing at that time. Ah, I gave him, ah, dispersal
> orders…told him needed to leave. Um, upon watching my video you can hear other
> officers in the line saying multiple times "Hey, you need to…you need to get out
> of here. You need to leave." Um, at which point I…there's kind of a flower bed
> or…and a bench there…at which point I passed those. Started walking his direction.
> Raised my mace up hopefully encouraging him that he needed to leave. At which
> point he yelled "F*** you." And then proceeded to turn, um, and kind of…I don't
> know if he was trying to get away from getting the mace in his face or what but he
> turned away from me at that time.

*Id*. When asked if Williams was trying to get away, Officer Hedlund responded:

> Yeah, he was . . . he was turned away or trying to run away but it was kind of, ah,
> almost like ah, little fenced in area so he didn't really have anywhere to go at that
> point.

*Id*. pp. 4-5. And when asked why he took Williams to the ground, Officer Hedlund answered:

> at that point he was running away. He was, you know, combative when he, you
> know, screamed "F*** you" directly at me. Um, and with running away, I just
> grabbed ahold of his shirt and pulled him to the ground.

*Id*. p. 5. Officer Hedlund indicated Williams "was initially on the sidewalk" and, from his

perspective, not on private property when they encountered him. *Id*.

Sgt. Robinson compiled the investigative materials, typed a summary, and submitted a

binder to staff in Officer Hedlund's chain of command for determinations. Within the summary,

Sgt. Robinson stated:

> I reviewed Officer Hedlund's BWC video. It shows Mr. Williams was in a public
> area and given several commands to leave/disperse the area. Mr. Williams
> responded to officers by stating "f*** you" prior to getting maced, taken to the
> ground and arrested.

Dkt. 26-2 p. 143. In his role in OPS, Sgt. Robinson does not make disciplinary determinations and

usually does not know the outcomes of investigations, including as to Williams' complaint.

Sgt. Robinson's report as to Williams' complaint proceeded through the levels of review within the Police Department including to Lieutenant David Seybert on July 15, 2020, to Captain Mark Wessels on July 24, 2020, and to Assistant Chief of Police Allan Tunks on July 24, 2020. Dkt. 50 pp. 2-6. Williams filed his civil complaint in Polk County district court on May 31, 2022. Assistant Chief Tunks forwarded the investigative report to Chief of Police Dana Wingert on June 2, 2022. *Id.* pp. 7-8. Each of the prior reviews recommended Williams' complaint against Officer Hedlund be classified as "unfounded." *Id.* pp. 2-8. In a handwritten note dated July 1, 2022, Chief Wingert indicated he agreed with the recommendation of unfounded. *Id.* p. 7.

As testified to during his deposition, Williams' pain from the pepper spray lasted a week. Dkt. 43 p. 80. Pain in his shoulder, arm, back, and hip from being tackled "still occasionally hurts . . . [a] number of times a week . . . [and] stops [him] from engaging in activity" such as riding his bike and running. *Id.* pp. 80-82.

## V. COURT'S ANALYSIS

This Court has original jurisdiction over the alleged violations of the United States Constitution and supplemental jurisdiction over the Iowa state claims. 28 U.S.C. § 1367(a); *see also Starkey v. Amber Enterprises, Inc.*, 987 F.3d 758, 765 (8th Cir. 2021). The Court will first address the alleged violations of the United States Constitution. And then address the remaining alleged claims under Iowa law.

### A. Alleged Violations of the United States Constitution

The federal claims against the law enforcement officers are brought by Williams pursuant to 42 U.S.C. § 1983 which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association.'" *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015) (quoting *Smith v. City of Minneapolis,* 754 F.3d 541, 547 (8th Cir. 2014) (internal quotation marks omitted)). Accordingly, "'a plaintiff must show each individual defendant's personal involvement in the alleged violation.'" *Molina v. City of St. Louis, Missouri*, 59 F.4th 334, 344 (8th Cir. 2023) (quoting *White v. Jackson*, 865 F.3d 1064, 1080-81 (8th Cir. 2017)); *see also Quraishi v. St. Charles Cnty., Missouri*, 986 F.3d 831, 837 (8th Cir. 2021) ("defendants must be individually involved in the unconstitutional act to be liable under § 1983").

Law enforcement officers are entitled to qualified immunity from civil liability under § 1983 when their "'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It is "an immunity from suit rather than a mere defense to liability," *id.*, and "protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. at 79; *see also Ross v. City of*

*Jackson, Missouri*, 897 F.3d 916, 920 (8th Cir. 2018) (quoting *White v. Pauly*, 580 U.S. at 78-79).

To determine whether qualified immunity applies, the Court considers two questions. First, when viewed in the light most favorable to plaintiff, do the facts demonstrate the officer violated a constitutional right? Second, was the constitutional right clearly established at the time of the officer's alleged violation? *See*, *e.g.*, *Laney v. City of St. Louis, Missouri*, 56 F.4th 1153, 1156 (8th Cir. 2023); *Just v. City of St. Louis, Missouri*, 7 F.4th 761, 766 (8th Cir. 2021); *Quraishi*, 986 F.3d at 835; *Ross*, 897 F.3d at 920; *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017); *Jackson*, 865 F.3d at 1074. If the answer to either question is "no," the officer is entitled to qualified immunity. *Laney*, 56 F.4th at 1156; *Jackson*, 865 F.3d at 1074.

"In order to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also*, *e.g.*, *Bell v. Neukirch*, 979 F.3d 594, 606-07 (8th Cir. 2020) (defining "clearly established" rights); *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (same). "'[E]xisting precedent must have placed the statutory or constitutional question beyond debate.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "Reciting an abstract right at a high level of generality will not suffice." *Ehlers*, 846 F.3d at 1008. "The dispositive question is "whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 11 (quoting *al–Kidd*, 563 U.S. at 741). The "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, 142 S.Ct. at 8 (quoted citation omitted).

With these well-established principles in mind, the Court will address each of Williams' federal constitutional claims as asserted against the individually named defendants.

### 1. Illegal Seizure

Under Count 1, Williams asserts claims against the City of Des Moines, Officer Hedlund, and Officer Paulson for illegal seizure in violation of the Fourth Amendment to the United States Constitution. Dkt. 20 ¶¶ 81-91. He alleges "[t]he actions of the Defendants in detaining, searching, seizing, and arresting [Williams] and his property without probable cause violated Williams' clearly established right to be free from a false arrest/seizure under the Fourth Amendment." *Id.* ¶ 82. He further alleges "Paulson reviewed, filed, and signed a citation with false information that she knew or should have known was false . . . Robinson failed to adequately preserve information related to Williams' complaint [and] Wingert did not timely complete the investigation into Williams' complaints regarding his illegal seizure." *Id.* ¶¶ 85-87.

Defendants contend the arrest of Williams was supported by probable cause. Dkt. 31 pp. 7-15. From their perspective, there are two bases for probable cause. *Id.* p. 7. First, there was probable cause to arrest "Williams for violation of Polk County's curfew order because he was outside his residence after 9:00 p.m." *Id.* pp. 7, 9-12. Second, there was probable cause to arrest "Williams for failure to disperse because there was reason to believe he had been part of the crowd at the Iowa State Capitol that had failed to disperse, which he was, and because he failed to disperse when officers directed him to." *Id.* pp. 7-8, 12-15. As such, defendants assert they are entitled to summary judgment on Count 1.

In resistance, Williams contends there was no probable cause to arrest him for either failure to disperse or for violating the curfew order. Dkt. 37-4 pp. 6-9. Williams asserts "he did disperse from the Capitol, was not given an additional order to disperse when he stood alone in front of his home, and did actually 'move' when ordered to 'move.'" *Id.* p. 6. Williams disputes he was on the sidewalk, contends the officers knew he was at his home at the time of his arrest, and emphasizes he was not arrested for or charged with violation of the curfew order. *Id.* pp. 7-8.

Pursuant to the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Stufflebeam v. Harris,* 521 F.3d 884, 886 (8th Cir. 2008)). "'It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments.'" *Ross*, 897 F.3d at 920 (quoting *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) (quoted citations omitted)). In turn, "[a] warrantless arrest does not violate 'the Fourth Amendment if it is supported by probable cause.'" *Jackson*, 865 F.3d at 1074; *see also Ehlers*, 846 F.3d at 1008; *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012).

"An officer has probable cause to make a warrantless arrest when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Jackson*, 865 F.3d at 1074 (internal quotation marks and citations omitted); *see also*, *e.g.*, *Ehlers*, 846 F.3d at 1009. "'Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Just*, 7 F.4th at 767 (quoting *Ross*, 897 F.3d at 920 (citation omitted)). Courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quote marks and citation omitted).

"The standard is a 'practical, nontechnical conception' that calls for 'facts and

circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Bell*, 979 F.3d at 603 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111-112 (1975)). While "not a high bar . . . it is a bar: An arrest must be supported by more than a reasonable, articulable suspicion that a person committed a crime." *Id.* "There must be a 'fair probability' or a 'substantial chance' that the person seized has committed an offense." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 246 (1983)).

An officer "'is entitled to qualified immunity for a warrantless arrest if the arrest was supported at the time by at least 'arguable probable cause.''" *Ross*, 897 F.3d at 921 (quoting *Joseph*, 712 F.3d at 1226 (quoted citations omitted)); *see also, e.g., Just*, 7 F.4th at 767; *Quraishi*, 986 F.3d at 836; *Hosea*, 867 F.3d at 955; *Jackson*, 865 F.3d at 1074; *Ehlers*, 846 F.3d at 1008-09. "'Arguable probable cause exists even where an officer mistakenly arrests a suspect believing [the arrest] is based on probable cause if the mistake is 'objectively reasonable.''" *Ross*, 897 F.3d at 921 (quoted citations omitted); *see also, e.g., Quraishi*, 986 F.3d at 836; *Bell*, 979 F.3d at 607; *Hosea*, 867 F.3d at 955; *Jackson*, 865 F.3d at 1074; *Ehlers*, 846 F.3d at 1009.

As explained by the Eighth Circuit, "the terms 'probable cause' and 'arguable probable cause' are not interchangeable, and each term serves a different purpose within the qualified immunity analysis." *Brown v. City of St. Louis, Missouri*, 40 F.4th 895, 901 (8th Cir. 2022). The Eighth Circuit has "assigned consideration of *actual* probable cause to [the] constitutional violation prong analysis while reserving any consideration of *arguable* probable cause for [the] clearly established prong analysis." *Id.* Accordingly, "even if an officer arrests an individual without *actual* probable cause—in violation of the Constitution—he has not violated that individual's 'clearly established' rights for qualified immunity purposes if he nevertheless had *arguable* probable cause to make the arrest." *Id.* (internal quotation marks and citation omitted).

"[Q]ualified immunity may apply if there was probable cause or arguable probable cause to arrest [an individual] for *any* crime at the time of the arrest." *Webster v. Westlake*, 41 F.4th 1004, 1012 (8th Cir. 2022) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). "[A]rguable probable cause is determined at the time of arrest and after-acquired knowledge is irrelevant to the analysis." *Hosea*, 867 F.3d at 956. "The fact that the person arrested is later found innocent is [also] not material." *Joseph*, 712 F.3d at 1226. "Whether a law enforcement officer had probable cause at the time of arrest is a question of law." *Id.* at 1226-27; *see also*, *e.g.*, *Just*, 7 F.4th at 767; *Hosea*, 867 F.3d at 955.

Here, in the opinion of this Court, there was probable cause to arrest and charge Williams with both violation of the Polk County's curfew order and failure to disperse under Iowa statutory law. The curfew order required all individuals located in Polk County to "remain in their place of residence during the hours" of 9:00 p.m. to 5:00 a.m. unless travelling to or from work, for medical assistance or family emergency, or for religious observance. Dkt. 26-2 p. 25. It is undisputed that when officers approached Williams he was outside and not inside his residence at the time of his arrest at 11:57 p.m. And there is no evidence Williams was travelling for work, medical assistance or family emergency, or religious observance. Under such facts, probable cause existed to arrest Williams for violation of the curfew order. *See Luong v. House*, 669 F.Supp.3d 735, 750-51 (S.D. Iowa 2023) (officers had probable cause to arrest plaintiffs for curfew violation; "It is undisputed that Plaintiffs were arrested just after midnight on June 2 when the county-wide curfew was in effect.").

It is not determinative, as asserted by Williams, whether he was on the sidewalk or just inside the alcove of the entryway to his residence. Again, it is undisputed he was outside and not inside his residence as the officers approached and observed him. Moreover, based on the body camera video, a reasonable conclusion could be drawn from the standpoint of the officers that

Williams was on a public sidewalk in front of a commercial building, not "in front of his home." The officers would have no reason to know the alcove was private property as asserted by Williams. In addition, the video and audio do not support Williams' contention he in fact informed the officers he was standing in front of his home. As conceded during his deposition, at most what could be heard is Williams' saying "disgraceful."

Even when viewed in the light most favorable to Williams, the record before this Court does not establish a genuine issue of fact material as to whether probable cause existed to arrest Williams for violation of the curfew order. And even if Officer Hedlund was mistaken as to Williams being on a public sidewalk as opposed to being "in front of his home," such a mistake was objectively reasonable under the circumstances, especially as depicted and heard on the body camera video. Arguable probable cause therefore exists, and Officer Hedlund is entitled to qualified immunity.

Turning to failure to disperse, at the time of Williams' arrest, Iowa statutory law provided as follows:

> A peace officer may order the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse. Any person within hearing distance of such command, who refuses to obey, commits a simple misdemeanor.

Iowa Code § 723.3 (2020). An unlawful assembly was defined as follows:

> An unlawful assembly is three or more persons assembled together, with them or any of them acting in a violent manner, and with intent that they or any of them will commit a public offense. A person who willingly joins in or remains a part of an unlawful assembly, knowing or having reasonable grounds to believe that it is such, commits a simple misdemeanor.

Iowa Code § 723.2 (2020).

In this Court's opinion, upon review of the evidentiary record submitted by the parties, the totality of the circumstances at the time of Williams' arrest was sufficient to lead a reasonable

officer to believe Williams had committed or was committing a criminal offense of failure to disperse. Based on the historical facts known to Officer Hedlund leading up to the arrest, it was reasonable to conclude from the standpoint of an objectively reasonable police officer that Williams had remained a part of or was in the immediate vicinity of an unlawful assembly, was within hearing distance of multiple, repeated commands by law enforcement to disperse and was refusing to obey those commands. Probable cause therefore existed to seize and arrest Williams for the simple misdemeanor of failure to disperse under Iowa statutory law. Furthermore, any mistake Officer Hedlund made in that regard was objectively reasonable and therefore arguable probable cause existed for Williams' seizure and arrest. Again, Officer Hedlund is entitled to qualified immunity.

Turning to the asserted claim against Officer Paulson, it bears repeating: "'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association.'" *Grider*, 785 F.3d at 1252 (quoted citation omitted). It is also a "settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable." *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005). Accordingly, "an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *Ehlers*, 846 F.3d at 1010; *see also Baude v. Leyshock*, 23 F.4th 1065, 1074-75 (8th Cir. 2022) (quoting *Ehlers*, 846 F.3d at 1010); *White v. Pauly*, 580 U.S. at 80 ("No settled Fourth Amendment principle requires [an] officer to second-guess the earlier steps already taken by his or her fellow officers.").

Here, the evidentiary record establishes Officer Paulson acted in reliance upon information provided by others in the law enforcement community as to Williams' seizure and arrest. And based on the evidentiary record before this Court, such reliance was reasonable under the totality

of the particular circumstances occurring in downtown Des Moines during the protests in late May and early June 2020. Williams has not presented sufficient facts showing any personal, particularized actions of Officer Paulson were violative of clearly established Fourth Amendment rights. And any mistake Officer Paulson made was objectively reasonable under the circumstances thereby entitling her to qualified immunity.

Turning to the asserted claim against the City of Des Moines, municipalities are "included among those persons to whom § 1983 applies [and] therefore, can be sued directly under § 1983." *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). But "[i]t is well established that a municipality cannot be liable under § 1983 under a respondeat superior theory, that is, solely because it employs a tortfeasor." *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021) (internal quotation marks and citations omitted). "A municipality may only be liable for a constitutional violation resulting from (1) an official municipal policy[,] (2) an unofficial custom, or (3) failure to train or supervise." *Id.* at 681-82.

In addition, the Eighth Circuit "'has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.'" *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019) (quoted citations omitted). "'Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* . . . liability.'" *Stockley v. Joyce*, 963 F.3d 809, 823 (8th Cir. 2020) (quoting *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)); *see also*, *e.g.*, *McKay v. City of St. Louis*, 960 F.3d 1094, 1102 (8th Cir. 2020) (absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the city); *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (there must be an unconstitutional act by a municipal employee before a municipality can be held liable).

As determined above, there was probable cause for the arrest of Williams and therefore no

violation of the Fourth Amendment by an employee of the City of Des Moines. Thus, there is no liability to which to attach the City. Moreover, the record before this Court does not contain evidence of either an official municipal policy or unofficial custom, or of a failure to train or supervise employees, which resulted in a constitutional violation against Williams.

In sum, even when viewed in the light most favorable to Williams, the particular facts in the evidentiary record before this Court do not demonstrate the named defendants violated a clearly established right under the Fourth Amendment at the time of the alleged violations as to the seizure and arrest of Williams. Defendants are entitled to qualified immunity and judgment as a matter of law as to the claims brought pursuant to the Fourth Amendment to the United States Constitution under Count I.

## 2. Excessive Force

Under Count 3, Williams asserts claims against the City of Des Moines and Officer Hedlund for using excessive force in violation of the Fourth Amendment to the United States Constitution. Dkt. 20 ¶¶ 102-12. Defendants contend they are entitled to summary judgment because the use of force against Williams was reasonable and did not violate the Fourth Amendment. Dkt. 31 pp. 19-24. They emphasize "Officer Hedlund was responding to hours of criminal activity occurring, and the crowd wasn't dispersing—it was a traveling, mobile riot." *Id.* p. 21. And from their perspective, Officer Hedlund used "minimally intrusive force" which "was very brief." *Id.* p. 22.

Williams on the other hand insists the force used by Officer Hedlund was not reasonable under the circumstances. Dkt. 37-4 p. 10. From Williams' perspective:

> [He] was alone in front of his home when he was attacked by law enforcement officers who had absolutely no need to spray him in the face with a painful chemical. He did not run. He was not dangerous or violent or armed. He was subdued in seconds. He did not resist. He complied with law enforcement.

*Id.* Williams contends that "[a]t the very least, there is a material fact in dispute about whether [he] was refusing to comply with the order to move (as argued by the Defendants at one point in their briefing) or whether he was actually running from the police evading arrest (as argued by Defendants in other points of their briefing and materials)." *Id.*

"'The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers.'" *Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999)); *Thompson v. Monticello, Arkansas*, 894 F.3d 993, 998 (8th Cir. 2018) (same). Claims that law enforcement officers used excessive force while making an arrest or other "seizure" of persons are analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Force is constitutionally excessive if it is objectively unreasonable." *Hosea*, 867 F.3d at 957. As instructed by the Supreme Court:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers'

> actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97 (internal citations omitted); *see also Lombardo v. City of St. Louis, Missouri*, 141 S.Ct. 2239, 2241 (2021) (Facts and circumstances to consider in a particular case include "'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting.'" (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

The principles set forth in *Graham* have been repeatedly cited and relied upon by the Eighth Circuit including within the context of arrests made during protest activities. *See*, *e.g.*, *Laney*, 56 F.4th at 1156; *McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022); *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022); *Burbridge v. City of St. Louis, Missouri*, 2 F.4th 774, 780 (8th Cir. 2021); *Fischer v. Hoven*, 925 F.3d 986, 988 (8th Cir. 2019); *Wilson*, 901 F.3d at 989; *Hosea*, 867 F.3d at 957; *Jackson*, 865 F.3d at 1074, 1079-80; *Bernini*, 665 F.3d at 1006. As summarized by the Eighth Circuit:

> The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest.

*Nieters v. Holtan*, 83 F.4th 1099, 1108 (8th Cir. 2023) (quoted citations omitted).

Here, under the evidentiary record before this Court, there are several genuine disputes as to facts material to whether the force used to arrest Williams was objectively reasonable under the

totality of the circumstances. Officer Hedlund testified Williams "had yelled profanities," and "was clearly agitated," "resistive towards us," "aggravated and not willing to comply with orders." In his report, Officer Hedlund wrote Williams had "turned around to run away from me." And during his interview with Sgt. Robinson, he indicated Williams was "yelling profanities towards our direction . . . . [h]e was acting aggressive towards us," "he was turned away or trying to run away," "he was running away . . . [and] combative when he . . . screamed "F*** you" directly at me." Officer Hedlund also testified Williams would "pose a danger – or could pose a danger." On the other hand, Williams attested he spoke "in a calm voice," "backed up quickly towards the gate to enter [his] his residence" when told to move, did not turn his back on the officers, and "did not flee from officers." He maintains he "did not yell 'f*** you' at the officers until after it was obvious that they were going to spray [him] in the face regardless of the fact that [he] was moving backwards as ordered."

In the Court's view, the body camera video of the interaction between Officer Hedlund and Williams supports certain portions of both parties' assertions and undermines other portions of both parties' assertions. Resolution of those disputed facts requires assessment of credibility and weighing of all the evidence. When the evidence in the record before this Court is viewed in the light most favorable to Williams, there are genuine issues of fact material as to whether Officer Hedlund used unconstitutionally excessive force.

As repeatedly stated by the Eighth Circuit: "'Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat.'" *Nieters*, 83 F.4th at 1108 (quoting *Wilson*, 901 F.3d at 989); *see also*, *e.g.*, *Westwater v. Church*, 60 F.4th 1124, 1131 (8th Cir. 2023) ("Our cases clearly established that it was objectively unreasonable to use more than *de minimis* force to seize a non-threatening misdemeanant who was not fleeing, resisting arrest, or ignoring officer

commands."); *Mitchell*, 28 F.4th at 898 ("Applying [the *Graham*] factors, we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him."); *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018) ("[S]everal cases establish that every reasonable official would have understood that he could not throw . . . a nonviolent, nonthreatening misdemeanant who was not actively resisting . . . face-first to the ground."); *Thompson*, 894 F.3d at 1000 ("'[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public.'" (quoted citation omitted)); *Hosea*, 867 F.3d at 957 (same). Accordingly, if Williams' version of his arrest is accepted as true, a jury could conclude the force utilized by Officer Hedlund was objectively unreasonable.

"Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate." *Banks v. Hawkins*, 999 F.3d 521, 525 (8th Cir. 2021). Such is the case here. Given the disputed material facts in the evidentiary record, this Court cannot conclude as a matter of law that the force used in seizing and arresting Williams, when the facts are viewed in a light most favorable to him, was objectively reasonable. Consequently, Officer Hedlund has not established entitlement to qualified immunity. The motion for judgment as a matter of law as to the claim of excessive force against Officer Hedlund under Count 3 must be denied.

As to any asserted liability of the City of Des Moines, the record before this Court does not contain evidence of either an official municipal policy or unofficial custom, or of a failure to train or supervise employees, which resulted in the alleged excessive force used by Officer Hedlund. Summary judgment is therefore warranted as to the City of Des Moines under Count 3.

### 3. Retaliation

Under Count 5, Williams asserts claims against the City of Des Moines, Sgt. Robinson, and Chief Wingert for retaliation in violation of the First Amendment to the United States Constitution. Dkt. 20 ¶¶ 124-41. Williams alleges he "was exercising his First Amendment rights and engaging in clearly-protected speech." *Id.* ¶ 126. He further alleges "Defendants violated [his] clearly established federal constitutional rights by pepper-spraying, tackling, hand-cuffing, and arresting [him] and by charging [him] with a crime in retaliation for his exercise of his First Amendment rights." *Id.* ¶ 127. As to Sgt. Robinson, Williams reasserts he "failed to adequately preserve information related to [Williams'] complaint." *Id.* ¶ 136. And as to Chief Wingert, Williams reiterates he "did not timely complete the investigation into [Williams'] complaints regarding his illegal seizure and excessive use of force." *Id.* ¶ 137.

In support of their summary judgment motion, defendants focus on the assertions against Sgt. Robinson and Chief Wingert related to the investigation into Williams' complaint after his arrest. Dkt. 31 pp. 26-29. Defendants contend neither Sgt. Robinson nor Chief Wingert took any adverse action against Williams in violation of the First Amendment or was motivated by any exercise of protected speech by Williams. *Id.* From defendants' perspective:

> [Williams] asserts nothing more than words. They weren't harassing words. The words attributed to Sgt. Robinson were in disagreement with Mr. Williams's account of what occurred. The only words used by Chief Wingert were to concur with the investigative findings. It would most certainly trivialize the First Amendment to connect an internal investigating officer letting someone know that their complaint is refuted by body camera video and chilling that person from protesting against the police. He got his investigation. He chose not to participate on advice of counsel. As for the investigation taking longer than indicated in a form letter, that can't possibly be chilling to a person of ordinary firmness to stop protesting. In any event, the person who had the investigation for an extended period of time was Assistant Chief Allan Tunks, who is not a named party.
>
> &#42; &#42; &#42;
>
> [Williams] made a complaint, and the complaint was fully investigated. Granted, it took some time, but it was completed. The investigation accurately depicted what was on the video. The transcripts of the officers' interviews contain their

perspective on the matter. Mr. Williams had an opportunity to speak about his experience, but he canceled on advice of counsel. There was simply no adverse action.

*Id.* pp. 28-29.

In response, "Williams submits that he was exercising his First Amendment rights by attending a march . . . to show his support for racial justice and to observe and bear witness to actions taking place by law enforcement and protestors." Dkt. 37-4 p. 3. He maintains that, at the time of his arrest, it was "clearly established that someone cannot be arrested for expressing their First Amendment rights." *Id.* p. 7. He refers to Officer Hedlund's statement that "I told you to leave, and you wanted to run your mouth" as evidence he was arrested for expressing his First Amendment rights. *Id.*

In addition, Williams claims defendants retaliated against him for filing the complaint with the Police Department. *Id.* p. 12. From his perspective, Officer "Hedlund and other employees and supervisors at the Des Moines Police Department began a multiple year quest to further retaliate against Williams specifically by trying to target his good standing as a member of the Iowa Bar." *Id.* p. 5. He contends Sgt. "Robinson called [him] in an attempt to intimidate him into withdrawing the complaint." *Id.* He also notes the phone call was not recorded and refers to text messages by Officer Hedlund as evidence of retaliation. *Id.* pp. 12-13.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "It protects 'symbolic or expressive conduct as well as . . . actual speech.'" *Molina*, 59 F.4th at 338 (quoted citation omitted). "'[N]onverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it.'" *Id.* at 341 (quoted citation omitted).

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v.*

*Bartlett*, 139 S.Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006));

*Laney*, 56 F.4th at 1157 (same). As explained by the Supreme Court:

> If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim.
>
> To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves*, 139 S.Ct. at 1722 (internal citations omitted).

As to Williams' assertions he was arrested and charged with a crime in retaliation for his exercise of his First Amendment rights, "it is clearly established that using an arrest (that lacks arguable probable cause) to interfere with First Amendment activity is a constitutional violation." *Quraishi*, 986 F.3d at 839. On the other hand, "a First Amendment retaliatory arrest claim is defeated by a showing of probable cause (or arguable probable cause)." *Just*, 7 F.4th at 768 (citing *Nieves*, 139 S. Ct. at 1724); *see also Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012) (existence of probable cause is fatal to First Amendment retaliatory arrest claim). Accordingly, because the Court has determined there was probable cause for arresting and charging Williams, his First Amendment claim on that basis fails as a matter of law.

The Court also finds Williams' First Amendment claim based on the filing of his complaint with the Police Department fails due to a lack of evidentiary support in the record. To establish such a claim, Williams must show: "(1) [he] engaged in protected expression; (2) [defendant] took an adverse action that would chill a person of ordinary firmness from continuing the activity; and (3) there was a but-for causal connection between [defendant's] retaliatory animus and [his] injury." *De Mian v. City of St. Louis, Missouri*, 86 F.4th 1179, 1182 (8th Cir. 2023) (citing *Brandy*

*v. City of St. Louis, Missouri*, 75 F.4th 908, 914-15 (8th Cir. 2023)); *see also*, *e.g.*, *Nieters*, 83 F.4th at 1110; *Quraishi*, 986 F.3d at 837.

Even when viewed in the light most favorable to Williams, the record before this Court does not establish a genuine issue of material fact as to whether Sgt. Robinson or Chief Wingert took retaliatory adverse actions against Williams. His assertions against both officers fall short of constituting adverse action that would chill a person of ordinary firmness from filing a complaint with the Des Moines Police Department. Moreover, the record does not contain evidence that either Sgt. Robinson or Chief Wingert acted with the requisite "retaliatory animus" to establish a but-for causal connection. To the contrary, the evidence establishes both officers acted in accordance with the OPS policy for investigating complaints.

Because Williams is unable to establish a violation of the First Amendment by an employee, there is no liability to which to attach the City of Des Moines. Moreover, again, the record before this Court does not contain evidence of either an official municipal policy or unofficial custom, or of a failure to train or supervise employees, which resulted in a constitutional violation against Williams.

In sum, Williams has not established there is a genuine issue for trial as to any defendant for the claims brought pursuant to the First Amendment to the United States Constitution. Based on the evidentiary record before this Court, the First Amendment retaliatory claims asserted by Williams fail as a matter of law. Defendants are therefore entitled to summary judgment as to Count 5.

### 4. Deliberately Indifferent Policies, Practices, Customs, Training and Supervision

Under Count 7, Williams asserts claims against the City of Des Moines and Chief Wingert for deliberately indifferent policies, practices, customs, training, and supervision in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Dkt. 20 ¶¶

156-69. In defendants' view, "Count 7 makes conclusory statements that Chief Wingert and the City have unconstitutional patterns and practices, but provides little information when it comes to describing what those were and how this has harmed Mr. Williams." Dkt. 31 pp. 41-42. Defendants contend there is no evidence in the record of a widespread pattern of unconstitutional misconduct by officers in the Des Moines Police Department, nor evidence the City or Chief Wingert being on notice of such misconduct, nor evidence of deliberate indifference or authorization of such misconduct. *Id.* pp. 43-44.

As previously noted, a municipality may "be liable for a constitutional violation resulting from (1) an official municipal policy[,] (2) an unofficial custom, or (3) failure to train or supervise." *Robbins*, 984 F.3d at 681-82; *see also*, *e.g.*, *Corwin v. City of Indep.*, 829 F.3d 695, 699 (8th Cir. 2016). But the evidentiary record before this Court lacks evidence of either an official municipal policy or an unofficial custom by the City of Des Moines which resulted in any of the constitutional violations asserted by Williams. Nor is there evidence that a failure to train or supervise City police officers resulted in any constitutional violations. In the Court's opinion, Williams' allegations are conclusory without sufficient evidentiary support and he has failed to establish any genuine issue for trial as to the claims under Count 7. Defendants are therefore entitled to summary judgment.

### 5. Conspiracy

Under Count 9, Williams asserts claims against the City of Des Moines, Sgt. Robinson, and Chief Wingert for conspiracy in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Dkt. 20 ¶¶ 183-92. Williams alleges defendants conspired to violate his constitutional rights including retaliation for his exercise of protected speech. *Id.* ¶ 186. He refers to Sgt. Robinson's telephone call as one example of an overt act in furtherance of the conspiracy. *Id.* ¶ 187. He again reiterates "Paulson reviewed, filed, and signed

a citation with false information that she knew or should have known was false . . . Robinson failed

to adequately preserve information related to [Williams'] complaint [and] Wingert did not timely

complete the investigation into Williams' complaints." *Id.* ¶¶ 188-90.

Defendants contend those "allegations do not state a claim for unconstitutional

conspiracy." Dkt. 31 p. 31. From their perspective:

> Mr. Williams does not have a right to have an investigating officer agree with his
> version of events when they are contradicted by video. Mr. Williams does not have
> a constitutional right to have his initial call from the investigating officer to
> schedule a meeting recorded. Finally, despite the fact that the City Manager gave a
> deadline for a response to his complaint, Mr. Williams is not constitutionally
> entitled to a quicker investigation.

*Id.* p. 34. Defendants emphasize "there is no evidence that Sgt. Robinson ever communicated with

Chief Wingert about this complaint." *Id.* pp. 34, 37. And defendants insist "[t]here is simply no

overt act that caused, in fact and proximately, any constitutional injury to Mr. Williams." *Id.* p. 36.

In response, Williams maintains "[t]here was, and seemingly is, an active conspiracy to try

to impact Williams's law license because he dared to complain about the police practices of the

Des Moines Police Department after he was violently assaulted in front of his own home." Dkt.

37-4 p. 13. He again refers to Sgt. Robinson's "intimidating" unrecorded phone call and text

messages sent to and from Officer Hedlund. *Id.* pp. 12-13.

In reply, defendants argue there is no evidence any individual took any action to impact

Williams' law license: "No complaint was made. No suspension of the license occurred. There is

no evidence anyone tried to do anything." Dkt. 41-3 p. 1. As for the text messages referred to by

Williams, defendants note they are isolated discussions over the course of years and emphasize

none are communications by Officer Hedlund with other named defendants. *Id.* p. 4. From

defendants' perspective, the record contains no evidence of communications among Officer

Hedlund, Officer Paulson, Sgt. Robinson, and Chief Wingert to even discuss "Williams let alone

conspire against him." *Id*. p. 5.

To establish a conspiracy claim under § 1983, Williams must prove: "'(1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him.'" *Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir. 2018) (quoting *Bonenberger v. St. Louis. Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016) (cleaned up)); *see also McKay v. City of St. Louis*, 960 F.3d 1094, 1102 (8th Cir. 2020) (setting forth same elements). As explained by the Eighth Circuit:

> "[T]he plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Id*. However, "[t]he plaintiff can satisfy this burden by pointing to at least some facts [that] would suggest the defendants reached an understanding to violate his rights." *Id*. (cleaned up); *see also White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008).

*Holmes*, 895 F.3d at 1001. "'[T]he plaintiff need not show that each participant knew the exact limits of the illegal plan, but the plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights.'" *Helmig v. Fowler*, 828 F.3d 755, 763 (8th Cir. 2016) (quoting *White*, 519 F.3d at 816 (internal quotation marks and citation omitted)). "'The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim.'" *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798 (8th Cir. 2013) (quoting *White*, 519 F.3d at 814). "Absent a constitutional violation, there is no actionable conspiracy claim." *Robbins v. Becker*, 794 F.3d 988, 997 (8th Cir. 2015) (internal quotation marks and citations omitted). Finally:

> Because "the elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a

conspiracy." *Westborough Mall, Inc. v. City of Cape Girardeau,* 693 F.2d 733, 743 (8th Cir.1982).

*Burton*, 731 F.3d at 799 (quoting *White,* 519 F.3d at 816).

Here, the evidence presented by Williams is insufficient to support a reasonable inference of a conspiracy. Even upon viewing the evidence in the light most favorable to Williams, there are insufficient facts in the present record before this Court that any of the defendants reached an agreement to deprive Williams of constitutionally protected rights or engaged in an overt act in furtherance of any alleged conspiracy. In the Court's opinion, the allegations of a conspiracy are conclusory without evidentiary support. In addition, other than the sole claim of excessive force against Officer Hedlund, Williams' constitutional claims fail to survive summary judgment. Williams has failed to establish a genuine issue of material fact as to whether any defendant conspired to deprive him of constitutional rights; consequently, his conspiracy claims under Count 9 fail as a matter of law.

## C. Alleged Violations of Iowa Common Law

### 1. Intentional Infliction of Emotional Distress

Under Count 10, Williams asserts state law claims of intentional infliction of emotional distress against "all defendants." Dkt. 20 ¶¶ 193-205. In support of these claims, Williams alleges "Trudy Paulson and Jacob Hedlund rushed at, pepper-sprayed, tackled, hand-cuffed, and caused harm and injuries to [Williams]." *Id.* ¶ 194. He again refers to Sgt. Robinson's telephone call and reiterates "Paulson reviewed, filed, and signed a citation with false information that she knew or should have known was false . . . Robinson failed to adequately preserve information related to [Williams'] complaint [and] Wingert did not timely complete the investigation into Williams' complaints." *Id.* ¶¶ 197-99. Williams alleges "[t]he conduct of Defendants was outrageous" and he "suffered severe or extreme emotional distress." *Id.* ¶¶ 200, 202.

"A claim of intentional infliction of emotional distress requires the plaintiff to prove: (1) the defendants engaged in extreme and outrageous conduct; (2) the defendants intentionally caused, or recklessly disregarded the likelihood of causing, severe or extreme emotional distress to the plaintiff; (3) the plaintiff in fact suffered severe or extreme emotional distress; and (4) the defendants' extreme and outrageous conduct was the actual and proximate cause of the severe or extreme emotional distress." *White v. Harkrider*, 990 N.W.2d 647, 652 (Iowa 2023) (citing *Lennette v. State of Iowa*, 975 N.W.2d 380, 391-92 (Iowa 2022); *Hedlund v. State of Iowa*, 930 N.W.2d 707, 723-24 (Iowa 2019)); *see also, e.g.*, *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (setting forth same elements).

Defendants contend they are entitled to summary judgment because none of the conduct that Williams complains of rises to the level of outrageous conduct required under Iowa law. Dkt. 31 pp. 38-41. In that regard, according to the Iowa Supreme Court, "[t]o be actionable, the allegedly tortious conduct must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *White v. Harkrider*, 990 N.W.2d at 652 (quoted citations omitted); *see also, e.g.*, *Lennette*, 975 N.W.2d at 392.

"'[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous.'" *White v. Harkrider*, 990 N.W.2d at 652-53 (quoting *Hedlund*, 930 N.W.2d at 724 (quoting *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991)). However, "'[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.'" *Smith*, 851 N.W.2d at 26 (quoting Restatement (Second) of Torts § 46, cmt. *h*, at 77 (1965)).

Here, even upon viewing the evidence in the light most favorable to Williams, there are

insufficient facts in the present record before this Court demonstrating the conduct complained of as to Officer Paulson, Sgt. Robinson, and Chief Wingert may reasonably be regarded as outrageous under Iowa law. In this Court's opinion, the conduct of those defendants was not so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Given the determination there was probable cause to arrest and charge Williams, their conducted related thereto cannot be deemed outrageous. As previously determined, Officer Paulson reasonably relied upon information from other law enforcement officers to process the criminal complaint against Williams. And the conduct of Sgt. Robinson and Chief Wingert in responding to Williams' complaint to the Police Department, in the opinion of this Court, falls well-short of rising to the level of outrageousness required to support a claim for intentional infliction of emotional distress.

As for the claim against Officer Hedlund, Williams contends "he was targeted that night for 'running his mouth,' pepper sprayed for no reason other than to cause him pain, . . . followed by fabrications to charge him with a crime, followed by actions that indicate an intent to attack his law license." Dkt. 37-4 p. 14. Williams insists there are questions of material fact as to whether Officer Hedlund's actions were "outrageous", and the claim should go to a jury. *Id.* pp. 14-15.

The same disputed facts material to Williams' claim of excessive force against Officer Hedlund are also material to his claim of intentional infliction of emotional distress against Officer Hedlund. When the evidence is viewed in the light most favorable to Williams, "reasonable men may differ" and, therefore, "it is for the jury . . . to determine whether . . . the conduct has been sufficiently extreme and outrageous to result in liability." *Smith*, 851 N.W.2d at 26. Officer Hedlund has not established entitlement to judgment on the claim as a matter of law.

Defendants' motion for summary judgment as to the claims brought under Count 10 is, therefore, granted except as to Officer Hedlund.

### 2. False Arrest/Imprisonment

Under Count 11, Williams asserts state law claims of false arrest/imprisonment against the City of Des Moines, Officer Hedlund, and Officer Paulson. Dkt. 20 ¶¶ 206-13. He alleges "Defendants detained [him] against his will" and the detention was unlawful. *Id.* ¶¶ 207-08. He again reiterates "Paulson reviewed, filed, and signed a citation with false information that she knew or should have known was false . . . Robinson failed to adequately preserve information related to [Williams'] complaint [and] Wingert did not timely complete the investigation into Williams' complaints." *Id.* ¶¶ 209-11. Defendants concede Williams was detained against his will but contend they are entitled to summary judgment because there was probable cause for his arrest. The Court agrees.

"A false arrest is one way of committing the tort of false imprisonment—restraining freedom of movement." *Children v. Burton*, 331 N.W.2d 673, 678 (Iowa 1983). The essential elements for false arrest under Iowa law "are (1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint." *Id.* at 678-79. "Once a plaintiff shows a warrantless arrest, the burden of proof shifts to the defendant to show justification for the arrest." *Id.* at 679. "When an officer acts with probable cause, he is protected even though the person arrested turns out to be innocent." *Id.*

Here, as determined above, there was probable cause for the arrest of Williams. Consequently, the state law claims of false arrest/imprisonment under Count 11 fail as a matter of law.

### 3. Malicious Prosecution

Under Count 12, Williams asserts state law claims of malicious prosecution against the City of Des Moines, Officer Hedlund, and Officer Paulson. Dkt. 20 ¶¶ 214-23. He alleges "Defendants acted with malice in initiating the charge against" him, there was no probable cause

for the charge, and the criminal prosecution was dismissed. *Id.* ¶¶ 219-21. He again reiterates "Paulson reviewed, filed, and signed a citation with false information that she knew or should have known was false . . . Robinson failed to adequately preserve information related to [Williams'] complaint [and] Wingert did not timely complete the investigation into [Williams'] complaints." *Id.* ¶¶ 216-18. Defendants contend they are entitled to summary judgment because there was probable cause for arresting and charging Williams and there is no evidence of malice. Dkt. 31 p. 25-26.

As explained by the Iowa Supreme Court, "'[a] malicious prosecution is one that is begun in malice, without probable cause to believe it can succeed, and which finally ends in failure.'" *Venckus v. City of Iowa City*, 990 N.W.2d 800, 807-08 (Iowa 2023) (quoted citation omitted). The elements of a malicious prosecution claim under Iowa law are as follows:

> (1) a previous criminal prosecution, (2) instigation of the prosecution by the defendant, (3) termination of the prosecution favorably to plaintiff, (4) want of probable cause, (5) malice of defendant in bringing the prosecution, and (6) damage to the plaintiff.

*Sisler v. City of Centerville*, 372 N.W.2d 248, 251 (Iowa 1985) (citing *Mills County State Bank v. Roure,* 291 N.W.2d 1, 3 (Iowa 1980)); *see also, e.g.*, *Klein v. Steinkamp*, 44 F.4th 1111, 1115 (8th Cir. 2022) (quoting *Sarvold v. Dodson*, 237 N.W.2d 447, 448 (Iowa 1976)); *Linn v. Montgomery*, 903 N.W.2d 337, 345 (Iowa 2017) (quoting *Wilson v. Hayes*, 464 N.W.2d 250, 259 (Iowa 1990) (quoting *Royce v. Hoening*, 423 N.W.2d 198, 200 (Iowa 1988))).

Given the Court has determined there was probable cause for arresting and charging Williams, he is unable to prove all the requisite elements for malicious prosecution against any defendant. *See Klein*, 44 F.4th at 1115 ("The existence of probable cause to arrest vitiates a claim for malicious prosecution against the arresting officer."); *Venckus*, 990 N.W.2d at 810 ("[A] malicious prosecution claim—continuing or otherwise—requires a lack of probable cause."). In

addition, there is a lack of evidence in the record before this Court demonstrating that Officer Paulson acted with malice. Consequently, the state law claims of malicious prosecution under Count 12 fail as a matter of law.

### 4. Assault and Battery

Under Count 13, Williams asserts state law claims of assault and battery against the City of Des Moines and Officer Hedlund. Dkt. 20 ¶¶ 224-32. He alleges "Hedlund subjected [him] to contact of an insulting and provoking nature" without his consent. *Id.* ¶¶ 225-26. Defendants contend "Williams cannot prevail on his assault and battery claim against Officer Hedlund for the same reasons he cannot prevail on the Fourth Amendment violation claim." Dkt. 31 p. 24. Williams contends there is a question of material fact as to whether Officer Hedlund used objectively reasonable force. Dkt. 37-4 p. 11.

In seeking summary judgment on this claim, defendants cite to Iowa Code section 804.8 which provides as follows:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

Iowa Code § 804.8. "Iowa courts apply an objective reasonableness standard to an officer's use of force." *Parrish v. Dingman*, 912 F.3d 464, 469 (8th Cir. 2019) (citing *Chelf v. Civil Serv. Comm'n of City of Davenport*, 515 N.W.2d 353, 355 (Iowa Ct. App. 1994) (citing *Graham,* 490 U.S. at 396-97)). As noted by the Iowa Court of Appeals, "[i]n deciding whether a particular use of force is objectively reasonable, 'courts examine the facts and circumstances of each case, including the crime's severity, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect actively resists arrest or flees.'" *Turk v. Iowa W. Racing Ass'n, Inc.*, 690 N.W.2d 695 (Iowa Ct. App. 2004) (quoted citation omitted).

As previously determined, under the evidentiary record before this Court, there are several

genuine disputes as to facts material to whether the amount of force used by Officer Hedlund to arrest Williams was reasonable under the totality of the circumstances. When the evidence is viewed in the light most favorable to Williams, there is a genuine issue for trial whether Officer Hedlund committed assault and battery under Iowa law. Ultimately it is for the jury to determine the truth of the matter. Given the disputed material facts in the summary judgment record, Officer Hedlund is not entitled to judgment as a matter of law on the claims of assault and battery under Count 13.

### 5. Emergency Response Immunity

Defendants contend Officer Hedlund is immune from liability on Williams' state law tort claims because he was acting in response to an emergency. Dkt. 31 pp. 44-47. Defendants cite to the Iowa Municipal Tort Claim Act which provides as follows:

> Except as otherwise provided in this chapter, every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function.

Iowa Code § 670.2(1).

> 1. The liability imposed by section 670.2 shall have no application to any claim enumerated in this section. As to any of the following claims, a municipality shall be liable only to the extent liability may be imposed by the express statute dealing with such claims and, in the absence of such express statute, the municipality shall be immune from liability:
>
>                     * * *
>
> k. A claim based upon or arising out of an act or omission of a municipality in connection with an emergency response including but not limited to acts or omissions in connection with emergency response communications services.

Iowa Code § 670.4(1)(k).

Defendants contend "Officer Hedlund's arrest of Mr. Williams and related actions are immune from common law torts because they were part of an emergency response." Dkt. 31 p. 46. From their view:

> The riot situation that occurred at the Iowa State Capitol and moved down Locust St. was an emergency because it arose unexpectedly and demanded immediate action. Responding to a riot is analogous to police responding to a 911 call regarding a bar fight which has been found to be an emergency. *Senn v. City of Des Moines*, 4:11-cv-00039, at *6-7 (S. D. Iowa Aug. 31, 2012). The existence of the emergency conditions is also demonstrated by Polk County's curfew order which repeatedly described the situation in the County as an emergency. (Curfew Order App. 25.) Officer Hedlund's actions in arresting and using force against Mr. Williams were in response to the ongoing emergency at that time.

*Id.* p. 46.

In response, Williams contends none of the alleged torts by Officer Hedlund occurred during an "emergency" and, therefore, he is not entitled to immunity from liability under the statute. Dkt. 37-4 p. 16. From Williams' perspective:

> First, even if the protests at the Capitol were an "emergency" under Iowa Code § 670.4(1)(k), none of the torts pled here happened at the protest at the Capitol. The assault happened while Williams was alone in front of his home. There was no emergency there. The arrest happened at the same time – still no emergency in front of Williams's home. If anything, the assault and arrest prevented officers from responding to the purported emergency happening around them – that is the destruction of property that other people were doing that night, not Williams. And then the remaining torts happened over the subsequent days and months. Officer Hedlund lied in his report. He knew the complaint contained multiple false statements and did not correct it. He falsely claimed Williams was involved in a "riot." He testified Williams was "running away" after stating on a recording that he was not running away. He tried to impact Williams's law license. None of these actions were taken as part of the purported "emergency." The Defendants' attempt to expand Iowa code § 670.4(1)(k) to provide immunity to Defendant Hedlund should be promptly rejected.

*Id.*

When the evidence in the record before this Court is viewed in the light most favorable to Williams, there are genuine issues of fact material as to whether the tort claims asserted against Officer Hedlund are based upon or arise out of an act or omission "in connection with an emergency response." The parties vigorously dispute whether there were ongoing riots versus peaceful protests at various times, especially when the interactions between Williams and Officer Hedlund occurred. The determination whether Officer Hedlund was in fact responding to an

"emergency" requires the assessment of witnesses' credibility and the weighing of evidence.

In an opinion relied upon by defendants, the Iowa Supreme Court noted "[n]either the legislature nor our court has specifically defined the statutory terms 'in connection with' or 'emergency response.'" *Adams v. City of Des Moines*, 629 N.W.2d 367, 370 (Iowa 2001). It was determined, however, the district court properly granted summary judgment on a negligent claim against a city firefighter whose conduct toward plaintiff occurred "in connection with an emergency response." *Id.* at 368.   In doing so, the Iowa Supreme Court held that the emergency response exception "does not limit immunity to actions taken contemporaneously with the emergency; it immunizes actions that are part of the emergency response." *Id.* at 371. Defendants here contend Officer Hedlund is entitled to immunity and summary judgment on the same basis as in *Adams*.

But as explicitly noted by the Iowa Supreme Court, the *Adams* case "must be limited to its undisputed facts":

> Here the conduct complained of occurred just shortly after the fire had been extinguished while firefighters remained at the house. The firefighters were still in the process of investigation and overhaul connected with the original response by emergency personnel. We hold that on these facts Iowa Code section 670.4[] affords the city of Des Moines immunity, as a matter of law, for its firefighter's action in telling Adams to move his truck.

*Id.* It was further emphasized: "Our decision with respect to section 670.4[] should not be interpreted to mean that the words 'in connection with an emergency response' will automatically immunize city firefighters for any post-emergency action, no matter how remote." *Id.*

This case presents factual circumstances readily distinguishable in many ways from *Adams*. And particularly, there are genuine issues of fact material to whether Officer Hedlund was responding to an "emergency" at the relevant times either contemporaneously with the emergency or as part of the emergency response. Officer Hedlund has not established as a matter of law

entitlement to immunity under Iowa Code § 670.4(1)(k).

## VI. CONCLUSION AND ORDER

Defendants' Motion for Summary Judgment (Dkt. 26) shall be and is hereby granted in part and denied in part.

As agreed to by plaintiff, judgment shall be entered as a matter of law in favor of defendants and against plaintiff as to the alleged violations of the Iowa Constitution under Counts 2, 4, 6, and 8 of the Second Amended Petition at Law. The claims against unidentified John Does 1-8 are also dismissed by agreement of plaintiff.

And as determined by the Court, judgment shall be entered as a matter of law in favor of defendants and against plaintiff as to all other claims except for the claims against Officer Jacob Hedlund under Count 3 for alleged use of excessive force in violation of the Fourth Amendment to the United States Constitution, under Count 10 for alleged intentional infliction of emotional distress under Iowa law, and under Count 13 for alleged assault and battery under Iowa law. Those claims must proceed to trial.

IT IS SO ORDERED.

Dated March 27, 2024.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE

55